Jeanne C. CASPER, Plaintiff,

v.

PAINE WEBBER GROUP, INC., a Delaware corporation, Painewebber Incorporated, a corporation and Ronald M. Schwartz, Defendants.

Civ. A. No. 90–4894 (AJL).

United States District Court,
D. New Jersey.

March 2, 1992.

Robert S. Ellenport, P.A., Clark, N.J., for plaintiff.

Sheldon M. Finkelstein, Hannoch Weisman, Roseland, N.J., for defendants.

## OPINION

LECHNER, District Judge.

This is an action brought by plaintiff Jeanne C. Casper ("Casper") against her former employer PaineWebber Incorporated ("PaineWebber Inc."), its parent company Paine Webber Group, Inc. ("Paine Webber Group") and Ronald M. Schwartz ("Schwartz"), Casper's former supervisor (collectively, the "Defendants"), for alleged violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*, the Equal Pay Act (the "EPA"), 29 U.S.C. § 206, and New Jersey common and statutory law. Diversity and federal question jurisdiction are alleged pursuant to 28 U.S.C. § 1332 and § 1331.

The Defendants move to dismiss the Amended Complaint (the "Amended Complaint").[1] For the reasons set forth below,

---

1. In support of its motion, the Defendants submit the Defendants' Memorandum in Support of Motion to Dismiss the Amended Complaint (the "Moving Brief"); the Defendants' Reply Memorandum in Further Support of Motion to Dis-

the motion is granted in part and denied in part.[2] Counts One through Five and Count Seven of the Amended Complaint are dismissed. The motion to dismiss is denied with respect to Count Six and Counts Eight through Fourteen.

*Facts*

Casper is a resident of Milltown, New Jersey. Amended Complaint, ¶ 7. Paine Webber Group is a securities firm which is incorporated in Delaware and which has its principal administrative and business offices in New York, New York. *Id.*, ¶ 8. The Amended Complaint alleges Paine Webber Group has done and is doing business in New Jersey. *Id.*, ¶ 8. Paine-Webber Inc. is a non-New Jersey corporation maintaining its principal place of business in New York, New York and has done and is doing business in New Jersey. *Id.*, ¶ 9. It is the wholly owned subsidiary of Paine Webber Group. *Id.* The Amended Complaint alleges, on information and belief, Schwartz is a resident of New York and has transacted and does transact business in New Jersey. *Id.*, ¶ 10.

The Amended Complaint alleges Casper was employed by PaineWebber Inc. as Compensation Director from approximately June 1987 to September 1989. *Id.*, ¶ 48. It alleges she was promoted to Corporate Vice President of PaineWebber Inc. in Sep-

tember 1989 and retained that position until 22 December 1989 when Casper was placed on administrative leave. *Id.*, 48, 89–92. On 23 February 1990, PaineWebber Inc. notified Casper she was being terminated from administrative leave and would be paid only through 31 December 1989. *Id.*, ¶¶ 48, 89–93.

The Amended Complaint alleges Paine Webber Group and its operating subsidiaries, including PaineWebber Inc., formed and implemented an unlawful scheme "[b]eginning not later than" 30 September 1986 "with respect to employee compensation" (the "Overriding Scheme"). Amended Complaint, ¶ 11. It alleges that on information and belief, this scheme continues "to this date." *Id.*, ¶ 17. The Overriding Scheme was allegedly implemented and furthered by means of "numerous schemes which included schemes to defraud by use of the mails and interstate wires, including the hiring of [Casper] by such means, securities fraud, coercion, violations by means of mail and wire fraud of numerous laws regarding employment compensation, and other wrongdoing," referred to in the Amended Complaint as "Implementing Schemes." *Id.*, ¶ 11. The Amended Complaint states:

> The goal of the Overriding Scheme to defraud and the various acts in further-

---

miss the Amended Complaint (the "Reply Brief").

In opposition to the motion, Casper submits the Brief in Opposition to Defendants' Motion to Dismiss (the "Opposition Brief").

The Defendants also submit the Certification of Ronald M. Schwartz and Casper submits the Certification of Jeanne C. Casper. Because a motion to dismiss is decided on the sufficiency of the allegations of the complaint, the Certifications of Ronald M. Schwartz and Casper are not considered.

2. Casper has had the opportunity to amend her complaint subsequent to being served a copy of the initial motion to dismiss. Casper filed the complaint in December 1990. On 12 February 1991 the Defendants served Casper with a copy of a motion to dismiss the complaint. On 1 April 1991 Casper served the Defendants a copy of her opposition to the motion to dismiss. Also on 1 April 1991 Casper filed the Amended Complaint. The Defendants reply was served on Casper on 31 May 1991. Also on 31 May 1991, the moving papers and opposition were filed with the court in accordance with the disposi-

tive procedure set forth in the General Rules of Civil Procedure for the District of New Jersey, 12C., App. 2.

The Amended Complaint adds four causes of action to the original complaint. It was drafted after Casper had notice of the motion to dismiss and with the assistance of the Defendants' initial moving brief. The initial motion to dismiss argued Casper lacked standing to sue for the section 1962(d) RICO violation alleged in the original complaint. The Amended Complaint adds counts for RICO violations of sections 1962(a), (b) and (c). Clearly, the Amended Complaint was added in response to the initial motion to dismiss.

Rather than proceed with the motion to dismiss, the parties were asked to re-brief the motion to dismiss to address the Amended Complaint. Because Casper amended the complaint after having received the initial motion to dismiss with the initial moving brief but prior to the filing of the motion, dismissal in part is now appropriate.

ance of the Overriding Scheme was to avoid compliance with various federal, state and local laws that would have resulted, had they been complied with, in increased tax payments and costs to Paine Webber [Group] and PaineWebber [Inc.] and in reductions in after-tax compensation to certain highly-placed executive officers of said Defendants and to certain employees who produced high volumes of business.

*Id.,* ¶ 12.

The Amended Complaint alleges various smaller schemes were implemented in order to further the goals of the Overriding Scheme. It alleges that in or about April 1987, PaineWebber International ("Paine-Webber International"), a division of Paine-Webber Inc., hired a broker in Puerto Rico. *Id.,* ¶ 22. It alleges that "[r]ather than calling the broker's income a bonus/salary which would be employee compensation subject to income tax and employer contributions, PaineWebber [Inc.], by and through its authorized employees including Defendant Schwartz directed that the transaction be characterized as a 'purchase of assets.'" *Id.,* ¶ 22. PaineWebber Inc. allegedly achieved illegal tax savings by reporting the broker's income in this manner. *Id.*

In addition, the Amended Complaint alleges that between 1987 and 1988, Paine-Webber International advised the "Compensation Division in New York" that various employees of the Defendants who worked in the London office worked " 'offshore' of Great Britain and therefore had no liability for Inland Revenue taxes to Great Britain." *Id.,* ¶ 25. It alleges that such advice resulted in tax reductions to those employees and to the Defendants. *Id.*

Other alleged schemes subsumed by the Overriding Scheme include:

(i) under reporting and improper reporting of employee compensation to the Internal Revenue Service and other tax authorities, (ii) withholding of bonuses and deferred compensation to certain employees involved in divorce proceedings so that such bonuses and deferred compen-

sation would only be reported after the divorce proceeding was settled or resolved, (iii) paying compensation without proper authorization and/or full disclosure pursuant to applicable federal and state securities laws and Securities and Exchange Commission rules and regulations and (iv) purchasing the homes of employees who were to be geographically relocated at prices higher than the respective appraised values of such homes, but not declaring as employee compensation the difference paid over the appraised value.

*Id.,* ¶ 30.

The Amended Complaint states the unlawful acts perpetrated in furtherance of the Overriding Scheme included "acts of mail and wire fraud in connection with the hiring, employment, and firing of [Casper] and acts of coercion in connection with her course of employment." *Id.,* ¶ 18. It alleges: "Prior to [Casper's] hiring in June of 1987, Defendants faced an increasing danger that their Overriding Scheme and racketeering activity in furtherance thereof might be discovered." *Id.,* ¶ 32. It states: "The circumstances evidencing the increasing danger of discovery faced by the Defendants and all those involved included, but were not limited to, the audit of expatriate employees by Great Britain's Inland Revenue and the need to conform all compensation and benefit plans and programs to recent changes made by the 1986 Tax Reform Act." *Id.,* ¶ 33.

The Amended Complaint alleges that accordingly, "in early or mid–1987, the Defendants decided that they should take action which would create the appearance that genuine efforts were being made to stop all unlawful practices like those described above." *Id.,* ¶ 34. It alleges the "Defendants decided the best way to create such an appearance would be to hire from outside the company a new well-qualified person to serve as director for the department in charge of compensation matters" at PaineWebber Inc., because "that department was responsible for overseeing many of the employee tax and other matters which had come under increasing scruti-

ny." *Id.,* ¶ 34. It states: "The employment of the Director would create the impression that top management was not involved in or previously aware of the unlawful activities, was very concerned about them and genuinely intended that they stop." *Id.,* ¶ 36.

The Amended Complaint states Casper was hired because "she had a good reputation, had never been employed by Paine Webber [Group] or any of its subsidiaries and affiliates, and was a highly trained and experienced manager, with expertise in the area of employee compensation and benefits and employee relations." *Id.,* ¶ 37. It alleges the scheme was furthered through a " 'reassignment' technique," whereby the Defendants "assign[ed] Casper to 'clean up' one unlawful practice, and then reassign[ed] her to another before the first type of practice had been corrected." *Id.,* ¶ 50. It further alleges: "When the 'reassignment' technique ultimately failed to completely stymie [Casper's] efforts to identify and attempt to correct the Defendants' illegal activities, the Defendants began to use more aggressive and coercive methods against Casper, including a systematic course of *de facto* demotions and changes in the nature of [her] employment, and ultimately, the firing of [Casper]." *Id.*

The Amended Complaint alleges that in or about April 1987, Casper travelled from New Jersey to PaineWebber Inc. offices in New York, New York to interview for a position at PaineWebber Inc. It alleges the "interview ... had been preceded by and arranged using communications through the U.S. mails and over interstate wire facilities." *Id.,* ¶ 42. The Amended Complaint states that during the course of the interview, Schwartz fraudulently represented:

a. That the Defendants were genuinely concerned about a variety of 'administrative' practices which they had previously been unaware of but had recently discovered and which required modifications and corrective procedures and controls.
b. That the Defendants intended to 'clean up' such activities, and would fully support [Casper]'s efforts to accomplish

the necessary changes; to wit, [Casper] would be given all appropriate resources including additional staff and computer hardware.
c. That one of the reasons for [Casper]'s hiring and one of her responsibilities was the review of all tax practices and other practices which pertained to employee compensation matters, and the revision of any practices which were improper or unlawful.
d. That [Casper] would have the responsibility and be given the authority to assure compliance with applicable foreign, United States, and state laws and regulations pertaining to the activities supervised by her department.
e. That [Casper] would be free to and would be expected to discharge her responsibilities in a professional manner, without any undue interference or pressure and would not be subjected to any arbitrary or capricious discipline, demotion or termination.

*Id.,* ¶ 43. The Amended Complaint concludes Casper was fraudulently induced to leave her "employment as Director, Corporate Compensation at American Express Company based upon the representations set forth above." *Id.,* ¶ 47.

In or about May 1987, the Defendants offered Casper the position of Compensation Director. *Id.,* ¶ 45. The Amended Complaint states the "offer and related employment forms and documents were transmitted to [Casper] from Defendants by means of the U.S. mails. These mail communications included the following: application forms, background check and [Securities and Exchange Commission ("SEC")] forms and Benefit Handbook forms." Amended Complaint, ¶ 45. It further states the "starting date of employment was initially communicated to [Casper] ... on or about May, 1987 by means of an interstate telephone call.,..." *Id.,* ¶ 46.

The Amended Complaint states that in September 1987, an audit revealed that PaineWebber Inc. had been classifying various employees as exempt from the Fair Labor Standards Act (the "FLSA") who were not exempt. *Id.,* ¶ 53. The Amended

Complaint states: "Notwithstanding the discovery of the practices in 1987, Casper was hindered by Defendants in one way or another in her efforts to end them, with the result that the practices, upon information and belief, continue to date." *Id.*, ¶ 54. It states that while Schwartz directed Casper to implement an audit to remedy the FLSA violations, he ordered her off the project before it was complete. *Id.*, ¶ 56. The Amended Complaint contends: "The Defendants['] false classifications of employees were reflected on documents which were transmitted by U.S. mail to the federal government and to the employees." *Id.*, ¶ 55.

In addition, Casper was allegedly directed to "clean up" any improper practices "with regard to the handling of expatriate compensation," such as the prior designation of employees working in the London office as being employed off-shore the coast of Great Britain. *Id.*, ¶ 57. Casper was removed from this assignment before it was complete. *Id.*, ¶ 58. The Amended Complaint alleges: "The Defendants' unlawful and fraudulent activities foreseeably resulted in uses of the U.S. mails and the international wires in furtherance of their Overriding Scheme," including such communications "made by Casper in pursuance of the bogus effort to remedy the tax problems." *Id.*, ¶ 59.

In addition, the Amended Complaint alleges Joseph J. Grano, Jr. ("Grano") was hired in February 1988 into a high level management position at PaineWebber Inc. *Id.*, ¶ 60. He was allegedly paid a sign-on bonus from PaineWebber Inc. of three million dollars. *Id.*, ¶ 61. The Amended Complaint alleges Casper was directed by Schwartz to fill out the pertinent paperwork to reflect that Grano both worked and lived in New Jersey, when in fact he worked at the New York office, in order to unlawfully save Grano the expense of paying New York taxes on the sign-on bonus. *Id.*, ¶ 64. The Amended Complaint alleges: "As a result of the fraudulent statements, New Jersey taxes were incorrectly withheld from Grano's signing bonus, which resulted in substantial illicit tax benefits to Grano, as compared with the New York

State and New York City taxes which should have been paid and in the filing of false information with the Internal Revenue Service in violation of 28 U.S.C.A. secs. 7204, 7206 and 7207." *Id.*, ¶ 64.

In addition, Casper was allegedly directed by Schwartz to devise a way to avoid full disclosure of the compensation of Mark Nussbaum ("Nussbaum"), another high level employee of PaineWebber Inc., in the 1989 proxy statement. *Id.*, ¶¶ 65–67. The Amended Complaint alleges Casper made a number of interstate telephone calls in an attempt to carry out the instructions of Schwartz. *Id.*, ¶ 68. The Amended Complaint alleges she eventually advised Schwartz it was not possible to legally avoid disclosure. *Id.*, ¶ 70. When the 1989 proxy statement was issued, it allegedly did not reveal the full extent of Nussbaum's compensation. *Id.*, ¶ 71. The Amended Complaint alleges such non-disclosure violated the Securities and Exchange Act, 15 U.S.C. § 78n(a) and Rules of the SEC promulgated thereunder, including 17 C.F.R. § 240.15a.101. *Id.*, ¶ 65.

The Amended Complaint also alleges that on or about 15 December 1988, PaineWebber Inc. issued $50,600,000.00 of convertible debentures to approximately fifty-five officers and selected senior executives. *Id.*, ¶ 73. It alleges such issuance had not first been approved by stockholder vote in violation of New York Stock Exchange Rules and Regulations and Regulation G of the SEC, 12 C.F.R. § 207.7 and/or Regulation U, 12 C.F.R. § 221. *Id.*, ¶¶ 74–76. It alleges that when Casper advised Schwartz such issuance should be subject to shareholder vote, she was advised "in interstate telephone communications" her concerns were "taken care of." *Id.*, ¶ 77. The Amended Complaint further states that even though Casper prepared information on the convertible debentures for the 1989 proxy statements, the 1989 proxy statements did not submit the convertible debentures to shareholder vote. *Id.*

Finally, the Amended Complaint alleges Casper sought to ascertain through a form which she prepared for completion by company executives the value of perquisites

they received. *Id.*, ¶ 78. The Amended Complaint alleges only a small percentage of the forms were returned to her. *Id.*, ¶ 79. It alleges she was directed by Schwartz not to follow up on forms which were not returned and was told that the "establishment of the procedure was sufficient to satisfy any inquiry and that there was no need to completely report as compensation the value of perquisites to executives." *Id.* After she objected to this instruction, she allegedly was told she would no longer be responsible for "reporting as income to employees the value of the perquisites they received." *Id.* The Amended Complaint alleges: "Consequently, Defendants under reported or failed to report compensation to the Internal Revenue Service in violation of 28 U.S.C. secs. 7204, 7206 and 7207." *Id.*

> The Amended Complaint further alleges: As part of the Overriding Scheme, the Defendants acted so as to coerce [Casper] into giving up her contractual rights with respect to the position for which she was employed. In particular, Defendants used fear of economic harm, harm to [Casper's] reputation, and other harm to gradually but effectively alter the nature of [Casper's] employment, and to force [Casper] to consent thereto or to acquiesce therein.

*Id.*, ¶ 80. It further states: "The coercive actions of Defendants included the gradual and systematic stripping of virtually all job responsibilities and authorities of [Casper] so that at the end there was little or no job left at all, and [Casper] was constructively discharged." *Id.*, ¶ 81.

The Amended Complaint further alleges at a meeting held 11 December 1989, Schwartz and other staff members reporting to Schwartz "told [Casper] that she no longer had any responsibility or authority regarding corporate employee relations and that her remaining staff of two (which was sixteen in September 1989) was to be reassigned." *Id.*, ¶ 86. The Amended Com-

plaint states this meeting was scheduled by "means of interstate telephone communications on or about December 7, 1989." *Id.* The Amended Complaint terms this decision of Schwartz a "constructive discharge" and was taken "in retaliation for [Casper's] failure to 'cooperate' with implementing certain of the policies and practices of PaineWebber [Inc.] and Paine Webber [Group] which [Casper] had advised her superiors either were not lawful or not in compliance with foreign, United States, and state laws, rules and regulations." *Id.*

On 14 December 1989, Casper allegedly sent Schwartz a memorandum through an interstate messenger in which she stated she was concerned about the alleged unlawful practices she had observed and in which she stated that she " 'should report various practices to the proper legal authorities....' " *Id.*, ¶ 87. On 15 December 1989, Casper learned the locks on her office had been changed pursuant to the directions of Schwartz. *Id.*, ¶¶ 89–90. On or about 22 December 1989, Casper was placed on administrative leave with pay until further notice. *Id.*, ¶ 92. On or about 23 February 1990, Casper was informed she was terminated "from administrative leave with pay and that she would be paid only through December 31, 1989." *Id.*, ¶ 93.[3]

The Amended Complaint alleges Casper has not been paid since 31 December 1989 and has not received the annual bonus "to which she was entitled under the agreement with the parties." *Id.*, ¶ 94. It further alleges the constructive and actual discharge by the Defendants constituted extortion: "Defendants forced and attempted to force [Casper] to surrender valuable property rights, including her contractual employment rights, by extortion and thereby obstructed, delayed, or affected commerce in violation of 18 U.S.C. sec. 1951." *Id.*, ¶ 98.

---

**3.** It is unclear from the record whether Casper was terminated or whether she resigned from her position with PaineWebber Inc. While the Amended Complaint states Casper was notified by mail that she was terminated, Amended Complaint, ¶ 93, it also states she was coerced "into voluntarily surrendering her valuable employment rights." *Id.*, ¶ 91. The Defendants contend Casper resigned. Moving Brief at 12.

On 13 December 1990 Casper filed her complaint (the "Complaint"). The Complaint contained ten counts, the Tenth Count alleging a violation of RICO, 18 U.S.C. § 1962(d).[4] On 12 February 1991 the Defendants served Casper with a brief in support of a motion to dismiss the Complaint. Although Casper prepared opposition to the brief, on 1 April 1991 she filed the Amended Complaint. The Amended Complaint contains fourteen counts, now adding counts alleging violations of RICO, 18 U.S.C. §§ 1962(a), (b) and (c) and violations of the New Jersey RICO statute, N.J.S.A. 2C:41-2(a), (b), (c) and (d).[5]

Count One of the Amended Complaint alleges the Defendants violated RICO, 18 U.S.C. § 1962(a). *See* Amended Complaint, ¶¶ 123-29. Count Two alleges the Defendants violated RICO, 18 U.S.C. § 1962(b). *See* Amended Complaint, ¶¶ 130-36. Counts Three and Four allege the Defendants violated RICO, 18 U.S.C. §§ 1962(c), *id.*, ¶¶ 137-42, and 1962(d), *id.*, ¶¶ 143-54. Count Five alleges the Defendants violated the New Jersey RICO statute, N.J.S.A. 2C:41-2(a), (b), (c) and (d). *Id.*, ¶¶ 155-157. Count Six alleges a violation of the New Jersey Conscientious Employee Protection Act (the "CEPA"), N.J.S.A. 34:19-1 *et seq.* *See id.*, ¶¶ 158-62. Count Seven alleges the Defendants violated public policy under New Jersey common law. *Id.*, ¶¶ 163-65. Count Eight appears to allege both the intentional and negligent infliction of emotional distress. *Id.*, ¶¶ 166-69. Count Nine alleges the Defendants violated the New Jersey Law Against Discrimination (the "NJLAD"), NJSA 10:5-1 *et seq.* and the EPA because they did not pay Casper compensation equal to that of "males in similarly situated job positions." *Id.*, ¶¶ 170-73. Counts Ten and Eleven allege replevin and conversion of personal property located in Casper's office by virtue of the change of the locks to her office. *Id.*, ¶¶ 174-84. Count Twelve alleges the Defendants denied Casper severance pay in violation of a written corporate policy and denied her an annual bonus due upon her departure from the corporate practice. *Id.*, ¶¶ 185-96. Count Thirteen alleges the Defendants are estopped based on their prior representations from denying Casper her severance pay. *Id.*, ¶¶ 197-200. Finally, Count Fourteen alleges PaineWebber Inc. "willfully and wantonly has refused to furnish severance pay" to Casper. *Id.*, ¶¶ 201-02.

The Amended Complaint alleges acts of mail fraud, wire fraud, extortion, tax fraud, and securities fraud (the "Predicate Acts") constitute a pattern of racketeering activity within the meaning of RICO (the "Pattern of Racketeering"). *Id.*, ¶ 103. The Amended Complaint alleges Paine Webber Group and PaineWebber Inc. with additional subsidiaries of PaineWebber Inc. constitute an enterprise (the "Enterprise") within the meaning of RICO. *Id.*, ¶ 116.

The Defendants now move for dismissal of the Amended Complaint in its entirety. The Defendants argue Casper does not have standing to sue for RICO violations. Specifically, they argue the goal of the alleged conspiracy was to avoid paying additional federal and state income taxes and was not directed at Casper. Moving Brief at 13-19; Reply Brief at 1-3. In addition, Defendants argue Casper does not have standing under section 1962(a), (b) and (c) because she cannot show that her alleged injuries were proximately caused by the alleged Predicate Acts. Moving Brief at 20-24; Reply Brief at 5-6. Furthermore, the Defendants argue Casper does not have standing to sue for violations of section 1962(d) because she was injured not by acts constituting Predicate Acts under RICO, but by termination of her employment. Moving Brief at 25-29; Reply Brief at 4. The Defendants also argue Casper has not sufficiently alleged the existence of a RICO enterprise given PaineWebber Inc. is designated in the Complaint as both the RICO person and enterprise within the meaning of 18 U.S.C. § 1962(c). Moving

---

4. The counts raised in the Complaint are set forth on page five of the Moving Brief.

5. The Defendants set forth the counts raised in the Amended Complaint on page five of the Moving Brief. The Moving Brief indicates the number of each claim in the Complaint and how the claims have been renumbered in the Amended Complaint. Moving Brief, 5.

Brief at 29–30; Reply Brief at 6. The Defendants argue the Complaint does not allege fraud and the RICO pattern requirement with the particularity required under Fed.R.Civ.P. 9(b) and court decisions. Moving Brief at 31–37; Reply Brief at 7.

As to the state law claims, the Defendants argue that Casper's election to bring suit under the CEPA waives any right to sue under other theories of liability by the terms of CEPA. Moving Brief at 38–42; Reply Brief at 9–12. With respect to Count Nine, the Defendants argue Casper has not adequately alleged a violation of the EPA and the LAD because Casper has not alleged she was compensated less than male employees who performed jobs which specifically required equal skill, effort and responsibility. Moving Brief at 43–46; Reply Brief at 8.

*Discussion*

### A. Standard of Review

■ A court may dismiss a complaint for failure to state a claim where it appears beyond doubt that no relief could be granted under any set of facts which could be proved consistent with the allegations. *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984); *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957); *Unger v. National Residents Matching Program,* 928 F.2d 1392, 1395 (3d Cir.1991); *Markowitz v. Northeast Land Co.,* 906 F.2d 100, 103 (3d Cir.1990); *Ransom v. Marrazzo,* 848 F.2d 398, 401 (3d Cir.1988). In deciding such a motion under Rule 12(b)(6) of the Federal Rules of Civil Procedure, all allegations in the complaint must be taken as true and viewed in the light most favorable to the plaintiff. *Gomez v. Toledo,* 446 U.S. 635, 636 n. 3, 100 S.Ct. 1920, 1921 n. 3, 64 L.Ed.2d 572 (1980); *Markowitz,* 906 F.2d at 103; *Melikian v. Corradetti,* 791 F.2d 274, 277 (3d Cir.1986); *Robb v. Philadelphia,* 733 F.2d 286, 290 (3d Cir.1984). Nevertheless, legal conclusions made in the guise of factual allegations are not given the presumption of truthfulness. *See, Papasan v. Allain,* 478 U.S. 265, 286, 106 S.Ct. 2932, 2944, 92 L.Ed.2d 209 (1986); *Haase v. Webster,* 807 F.2d 208, 215 (D.C.Cir.1986); *Briscoe v. La Hue,* 663 F.2d 713, 723 (7th Cir.1981), *aff'd,* 460 U.S. 325, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983); *Western Mining Council v. Watt,* 643 F.2d 618, 626 (9th Cir.), *cert. denied,* 454 U.S. 1031, 102 S.Ct. 567, 70 L.Ed.2d 474 (1981).

The Supreme Court has stated that "RICO is to be read broadly," in light of "Congress' ... express admonition that RICO is to 'be liberally construed to effectuate its remedial purposes' ... [which] are nowhere more evident than in the provision of a private action for those injured by racketeering activity." *Sedima, S.P.L.R. v. Imrex Co.,* 473 U.S. 479, 497–98, 105 S.Ct. 3275, 3285–86, 87 L.Ed.2d 346 (1985) (quoting Pub.L. 91–452, section 904(a), 84 Stat. 947); *see also Northeast Women's Center, Inc. v. McMonagle,* 868 F.2d 1342, 1348 (3d Cir.), *cert. denied,* 493 U.S. 901, 110 S.Ct. 261, 107 L.Ed.2d 210 (1989) ("[W]e are not free to read additional limits into RICO once a plaintiff has made out all of the elements required for a finding of liability under the statute's explicit provisions.").

### B. RICO Standing

■ Under 18 U.S.C. § 1962(a), it is illegal to use or invest income derived "from a pattern of racketeering activity" to acquire an interest in or to operate an enterprise engaged in interstate commerce. *See* 18 U.S.C. § 1962(a); *H.J. Inc. v. Northwestern Bell Telephone Co.,* 492 U.S. 229, 233, 109 S.Ct. 2893, 2897, 106 L.Ed.2d 195 (1989). A person who has been injured by such a violation may bring an action under 18 U.S.C. § 1964(c), which provides: "Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee." 18 U.S.C. § 1964(c).

There is a split among the circuits on the issue of whether standing to sue for a violation of section 1962(a) is sufficiently stated by alleging an injury caused by predicate acts or whether it is necessary to allege an injury caused by the actual in-

vestment or use of the proceeds of the racketeering activity. The majority view, and that adopted by the Third Circuit, is that in order to have standing to sue for violations of section 1962(a), a plaintiff must show injury by reason of the use or investment of racketeering income. *See, e.g., Glessner v. Kenny,* 952 F.2d 702, 708 (3d Cir.1991); *R.R. Brittingham v. Mobil Corp.,* 943 F.2d 297, 304 (3d Cir.1991); *Ouaknine v. MacFarlane,* 897 F.2d 75 (2d Cir.1990); *Craighead v. E.F. Hutton & Co.,* 899 F.2d 485 (6th Cir.1990); *Grider v. Texas Oil & Gas Corp.,* 868 F.2d 1147 (10th Cir.) *cert. denied,* 493 U.S. 820, 110 S.Ct. 76, 107 L.Ed.2d 43 (1989); *Rose v. Bartle,* 871 F.2d 331 (3d Cir.1989); *Princeton Economics Group, Inc. v. AT & T,* 768 F.Supp. 1101, 1111 (D.N.J.1991). *But see Busby v. Crown Supply, Inc.,* 896 F.2d 833, 836–40 (4th Cir.1990) (finding that injury from predicate acts is sufficient to give rise to standing to sue for violations of 1962(a)).

Under the approach adopted by the Third Circuit, a plaintiff must allege not only the elements of § 1962(a), but also that the RICO violation caused injury in plaintiff's business or property. *Rose,* 871 F.2d at 356–57; *accord Princeton Economics,* 768 F.Supp. at 1112. The *Rose* court held: "[R]equiring the allegation of income use or investment injury 'is consistent with both the literal language and the fair import of the language [of section 1962(a) ].' " *Id.* at 358 (citation omitted). The Third Circuit found the plaintiff adequately alleged use or investment of proceeds from racketeering activity but found the plaintiff did not sufficiently allege standing because the complaint contained no allegations as to injury by virtue of the defendants' use or investment of racketeering income. *Id.* at 357; *see also Kehr Packages, Inc. v. Fidelcor, Inc.,* 926 F.2d 1406, 1411 (3d Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 2839, 115 L.Ed.2d 1007 (1991); *Banks v. Wolk,* 918 F.2d 418, 421 (3d Cir.1990).

Courts adopting this approach find that injury caused by predicate acts of racketeering will not give rise to standing to sue for a violation of section 1962(a). In *Brittingham,* individual consumers sued defendants who produced and marketed a "degradable" trash bag which the plaintiffs alleged was not degradable. 943 F.2d at 299. The plaintiffs alleged they were injured because they paid a higher price as a direct result from the defendants fraudulent activities. The plaintiffs alleged that the proceeds from the "degradable" trash bags were reinvested by the defendants and permitted them to continue the fraudulent scheme. *Id.* at 304. The court held these remote allegations of injury from use or investment were insufficient to establish the requisite injury under section 1962(a). *Id.*

In *Ouaknine,* a number of investors sued defendants who had allegedly induced them to enter into a number of financial transactions, to their loss, through allegedly false representations. 897 F.2d at 78–79. The plaintiffs sued the defendants under section 1962(a), alleging predicate acts of securities fraud. The Second Circuit held the RICO claim was properly dismissed by the district court because the complaint did not allege facts "asserting injury by reason of defendants' investment of racketeering income...." *Id.* at 83.

In *Grider,* the plaintiff held a working interest in a group of oil and gas wells and sued the well operators for violations of section 1962(a). 868 F.2d at 1148. The plaintiff alleged that the defendants had engaged in a scheme to reduce his profit by, *inter alia,* illegally venting natural gas, stealing natural gas from the wells for drilling operations, selling gas without paying him the appropriate revenue and unlawfully fixing prices. *Id.* As to a second scheme, the plaintiff alleged the defendants, *inter alia,* breached their fiduciary duty to him, conspired to fix prices, failed to pass on his share of rebates and discounts and withheld his share of production revenues. *Id.* The plaintiff alleged the defendants carried out these schemes by engaging in predicate acts of mail fraud. *Id.* at 1148–49. In rejecting an approach to standing whereby injury caused by predicate acts was deemed sufficient and in denying the plaintiff standing, the Tenth Circuit held:

[W]e find no justification for disregarding the clear language of either section 1962(a), which prohibits the use or investment of income from racketeering activity, or section 1964(c), which requires injury by reason of such a violation. Accordingly, we hold that, because [the plaintiff] has failed to allege any facts showing injury from the use or investment of racketeering income, he has no standing to assert a claim for damages based on a violation of section 1962(a).

*Grider*, 868 F.2d at 1150–51.

Similarly, in *Craighead*, investors sued an investment broker after the investment broker invested funds to the investors' loss, without the investors' authorization. 899 F.2d at 488. The investors sued the company with which the investment broker was employed for violations of 1962(a), alleging predicate acts of mail fraud. The Sixth Circuit held: "[The plaintiffs] have not alleged injuries stemming directly from the defendants' alleged use or investment of their illegally obtained income. Unlike section 1962(c), section (a) requires such a *separate and traceable injury*, and plaintiffs have alleged only injuries traceable to the alleged predicate acts." *Id.* at 494 (emphasis added).

District courts within the Third Circuit have likewise taken the view that where the plaintiff's injuries are traceable only to the predicate acts, the plaintiff has not sufficiently alleged standing to sue for violations of section 1962(a). In *Zimmer v. Gruntal & Co.*, 732 F.Supp. 1330 (W.D.Pa. 1989), the plaintiff investors sued an investment company which invested their money in real estate development to their loss. *Id.* at 1334. The court found the plaintiffs had no standing to sue under section 1962(a), stating:

We carefully have reviewed the complaint and we find no express or implied allegations that plaintiffs were injured by defendant Gruntal's investment in, or income derived from, [the real estate developments] or Gruntal. Likewise, plaintiffs' RICO Case Statement indicates that their only injury arises from their loss of investments and income into Woodcrest. . . .

Because the only alleged injury, *i.e.*, loss of investments and income, was complete upon the taking of plaintiffs' funds, we agree with defendants that plaintiffs have not alleged an injury arising from defendants' subsequent use of the proceeds from these alleged racketeering activities. Without the requisite causal link between the investment and plaintiffs' injury, the Section 1962(a) claims are insufficient as a matter of law and shall be dismissed.

*Id.* at 1334 (footnote omitted).

In *Curley v. Cumberland Farms Dairy, Inc.*, 728 F.Supp. 1123 (D.N.J.1989), the plaintiffs filed a class action against a retail convenience store chain alleging an extortion scheme by officers of the corporation. *Id.* at 1126–27. The plaintiffs alleged low-level employees were wrongfully accused of stealing money and merchandise and forced to sign a confession under the threat of arrest and notification of family members. *Id.* There, the court likewise considered the argument of the plaintiffs that they had standing because they alleged the reinvestment by the defendants of racketeering income into the enterprise permitted the enterprise to flourish and to perpetuate the alleged racketeering activity. Citing *Grider* and *Rose*, the court observed that "a plaintiff seeking civil damages for a violation of section 1962(a) must plead facts tending to show that he was injured by the use or investment of racketeering income." *Id.* at 1139. The *Curley* court held the plaintiffs failed to allege standing:

In the instant case, plaintiffs have not shown an injury sufficient to confer standing under § 1962(a). Plaintiffs' argument that they have suffered as a result of the proceeds of one incident of alleged extortion being used to pay the loss prevention specialist who commits the next alleged act of extortion falls short of the required injury. If plaintiffs' view of standing were correct, RICO plaintiffs would be required to plead no more than that the proceeds from one predicate act enabled the enter-

prise to continue to commit other predicate acts. This view effectively eliminates the standing requirement under § 1962(a), and the court rejects it.

*Id.* at 1139, *see also Insurance Consultants of America, Inc. Employee Pension Plan v. Southeastern Insurance Group, Inc.,* 746 F.Supp. 390, 413 n. 20 (D.N.J. 1990) (plaintiffs did not have standing under section 1962(a) where they did not allege they were harmed by the investment of racketeering income).

Lastly, in *Princeton Economics,* the plaintiff asserted it had standing to sue for an alleged violation by AT & T of section 1962(a) because it was induced to purchase a conference calling system, known as the Spirit System, through fraudulent representations contained in the Spirit System Brochure, which plaintiff received from AT & T. 768 F.Supp. at 1114. Plaintiff asserted this conduct constituted an injury to it by virtue of AT & T's use or investment of racketeering income. It stated AT & T's use or investment of proceeds from such fraudulent representations "allowed the AT & T enterprise to continue its operations, and allowed defendant AT & T to continue its fraudulent and misleading advertising." *Id.* at 1115.

The allegations of Princeton Economics as to its standing to sue for a violation of section 1962(a) were found to be insufficient. Princeton Economics alleged injury by virtue of having allegedly been fraudulently induced to purchase the Spirit System. It did not allege injury by virtue of AT & T's use or investment of racketeering income, which is necessary to establish a cognizable injury through the use or investment of money obtained from racketeering. *Id.*

In this case, Casper alleges the Defendants "used or invested, directly or indirectly, part of all of the income received by said Defendant or the proceeds of such income, which income was derived directly or indirectly from the Predicate Acts and the Pattern of Racketeering Activity ... in acquisition of an interest in, or the establishment or operation of, the Enterprise, in violation of 18 U.S.C. sec. 1962(a)." Amended Complaint, ¶ 123.

The Amended Complaint further alleges: By reason of the Defendants' violations of 18 U.S.C. sec. 1962(a) Casper was injured in her business or property. The harm to [Casper] includes but is not limited to the pecuniary and other loss she suffered as a result of being hired pursuant to a fraudulent scheme and acts of mail and wire fraud in furtherance of the scheme, as a result of being employed in a position whose nature and course was a product of the fraudulent scheme involving mail and wire fraud, as a result of being discharged as a result of a fraudulent scheme and acts of mail and wire fraud in furtherance thereof, and as a result of coercive activities of the Defendants. The injuries suffered by [Casper] were the entirely natural, foreseeable, and proximate result of the Defendants' Predicate Acts, of their Pattern of Racketeering, and of their conduct constituting violations of 18 U.S.C. sec. 1962(a). *Id.,* ¶ 127. Casper argues the proceeds the Defendants received from their racketeering activities enabled them to more effectively compete for employees. Opp. Brief at 24. Casper argues the Defendants used the racketeering proceeds to pay employees higher salaries which caused injury to her when she was lured away from her prior job by the higher salary from PaineWebber Inc. *Id.;* Amended Complaint, ¶¶ 13, 31, 47, 82.

■ To the extent Casper alleges injury because the Defendants were able to lure her away from her prior job because of the high salary they were able to offer her, the allegation is without merit. As was established in *Shearin v. E.F. Hutton Group, Inc.,* 885 F.2d 1162, 1170 (3d Cir.1989), a plaintiff cannot claim injury as a result of leaving a prior job for a new job at which plaintiff was employed for over two years at a higher salary. In this case, Casper does not contest the fact that she received a higher salary at PaineWebber Inc. and was employed there for two years.

■ Casper's allegation that she was injured by virtue of having been terminated

from her position at PaineWebber, Inc. and suffered economic harm as a result is also insufficient to establish standing under section 1962(a). Beyond stating in conclusory fashion that her discharge was caused by the Defendants' use or investment of racketeering proceeds for the Enterprise, Casper does not allege facts showing that the injury was caused by such alleged use or investment of racketeering proceeds. As was the case in *Princeton Economics* and *Curley*, the Amended Complaint does not allege facts demonstrating that she was injured as a result of the Defendants' investment of the income derived from the Predicate Acts and Pattern of Racketeering. Accordingly, Count One is dismissed because Casper has failed to adequately allege standing to sue for a violation of section 1962(a).[6]

1. *Count Two—18 U.S.C. § 1962(b)*

■■■ Under section 1962(b), it is unlawful "for any person through a pattern of racketeering activity or through collection of a unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce." 18 U.S.C. § 1962(b). In order to allege standing to sue under this section, a plaintiff must allege injury from the defendant's acquisition or control of an interest in a RICO enterprise, in addition to injury from the predicate acts. *Danielsen v. Burnside-Ott Aviation Training Ctr., Inc.*, 941 F.2d 1220, 1231 (D.C.Cir.1991); *U.S. Concord, Inc. v. Harris Graphics Corp.*, 757 F.Supp. 1053, 1060 (N.D.Cal.1991); *Insurance Consultants of America*, 746 F.Supp. at 413; *Helman v. Murry's Steaks, Inc.*, 742 F.Supp. 860, 882 (D.Del.), *reh'g denied*, 743 F.Supp. 289 (D.C.Del.1990); *Midwest Grinding Co. v. Spitz*, 716 F.Supp. 1087, 1090–91 (N.D.Ill.1989); *Schwartz v. Philadelphia Nat'l Bank*, 701 F.Supp. 92, 94 (E.D.Pa.1988), *aff'd* 879 F.2d 859 (3d Cir.

1989); *Leonard v. Shearson Lehman/American Express Inc.*, 687 F.Supp. 177, 181 (E.D.Pa.1988). Such an injury may be shown, for example, where the owner of an enterprise infiltrated by the defendant as a result of racketeering activity is injured by the defendant's acquisition or control of his enterprise. *U.S. Concord*, 757 F.Supp. at 1060 n. 12; *Helman*, 742 F.Supp. at 882 (injury must stem from acquisition or maintaining control).

■■■ The Amended Complaint alleges the Defendants acquired or maintained, indirectly and directly, an interest in or control of the Enterprise through the Pattern of Racketeering. Amended Complaint, ¶¶ 132–34. It alleges Casper has standing to sue for a violation of section 1962(b) by stating:

> Defendants' violations of 18 U.S.C. sec. 1962(b) proximately caused injury to [Casper] in her business or property in that [Casper] was harmed by reason of Defendants' perpetration of the Predicate Acts, by reason of their Pattern of Racketeering Activity, and by reason of their violations of 18 U.S.C. sec. 1962(b). But for the Defendants' acquisition and maintenance through their Pattern of Racketeering Activity of interests in and control over the Enterprise they could not have perpetrated their illegal activities and schemes, including those which directly injured [Casper]. [Casper's] injuries were the direct, natural, foreseeable, and proximate result of Defendants' racketeering violations in that her hiring, the course and nature of her employment, and her firing were all in furtherance of and a part of Defendants' acquisition and maintenance of interests in and control of the Enterprise through their Pattern of Racketeering Activity.

*Id.*, ¶ 135.

In essence, Casper alleges that her injury consists of the hiring of and discharge from her position at PaineWebber Inc.

---

**6.** Casper also states she was injured "as a result of being employed in a position whose nature and course was a product of the fraudulent scheme" and "as a result of coercive activities of the Defendants." Amended Complaint, ¶ 127.

Again, Casper does not state sufficient facts alleging how the Defendants' use or investment of racketeering proceeds caused the alleged injury.

The Amended Complaint alleges each Defendant acquired control over the Enterprise through the Pattern of Racketeering. However, the allegations of standing appear to amount only to an allegation that the Defendants' control over the Enterprise enabled them to carry out the Predicate Acts and actually or constructively fire Casper. Casper advances a "but for" argument; but for the acquisition or control, Defendants would not have been able to carry out the Predicate Acts which injured her. The Amended Complaint does not allege Casper was injured by virtue of the alleged acquisition of control over the Enterprise through the Pattern of Racketeering Activity, which is the conduct forbidden by section 1962(b).

Because Casper has not satisfied the first requirement for standing under section 1962(b), whether she alleged an injury from the Predicate Acts need not be determined. Casper has not adequately alleged standing to sue for a violation of section 1962(b); accordingly, Count Two is dismissed.

2. *Count Three—18 U.S.C. § 1962(c)*

Under section 1962(c), it is unlawful for "any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c). As to standing to sue for a violation of section 1962(c), a "plaintiff only has standing if, and can only recover to the extent that, he has been injured in his business or property by the conduct constituting the violation.... [T]he compensable injury necessarily is the harm caused by predicate acts sufficiently related to constitute a pattern.... Any recoverable damages occurring by reason of a violation of § 1962(c) will flow from the commission of the predicate acts." *Sedima*, 473 U.S. at 496–97, 105 S.Ct. at 3285–85.

The Amended Complaint alleges: "By means of the acts of mail fraud, wire fraud, coercion, securities fraud, and the other illegal activities set forth above the Defendants have conducted the Enterprise's affairs, and have thereby achieved tax savings and other benefits which have redounded to the benefit of the Enterprise and the Defendants, and to the benefit of certain other highly-compensated personnel participating in the illegal activities." Amended Complaint, ¶ 140(a). It alleges Casper has standing to sue for the alleged violation of section 1962(c) in the following manner:

> Defendants' violations of 18 U.S.C. sec. 1962(c) proximately caused injury to [Casper] in her business or property in that [Casper] was harmed by reason of Defendants' perpetration of the Predicate Acts, by reason of their Pattern of Racketeering Activity, and by reason of their violations of 18 U.S.C. sec. 1962(c). But for the Defendants' conduct of the Enterprise through their Pattern of Racketeering Activity they could not have perpetrated their illegal activities and schemes, including those which directly injured [Casper]. [Casper's] injuries were the direct, natural, foreseeable, and proximate result of Defendants' racketeering violations in that her hiring, the course and nature of her employment, and her firing were all in furtherance of and a part of Defendants' conduct of the Enterprise through their Pattern of Racketeering Activity.

*Id.*, ¶ 141.

The cases are legion which hold that a plaintiff, in a suit against the plaintiff's former employer, does not have standing to sue for a violation of section 1962(c) where the plaintiff's injury consists of termination from his job for "blowing the whistle" on or for failure to cooperate with his employer's racketeering activity. *See, e.g., Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21, 24–25 (2d Cir.1990) ("[T]he purpose of civil RICO liability does not extend to determining any illegal act such as retaliatory firings for which there are state and common law remedies."); *see also Kramer v. Bachan Aerospace Corp.*, 912 F.2d 151, 154–56 (6th Cir.1990); *O'Malley v. O'Neill*, 887 F.2d 1557, 1560–63 (11th Cir.1989);

*Burdick v. American Express Co.*, 865 F.2d 527, 529 (2d Cir.1989); *Cullom v. Hibernia National Bank,* 859 F.2d 1211, 1214–17 (5th Cir.1988); *Nodine v. Textron, Inc.,* 819 F.2d 347, 349 (1st Cir.1987); *Pujol v. Shearson/American Express, Inc.,* 829 F.2d 1201, 1205 (1st Cir.1987); *Morast v. Lance,* 807 F.2d 926, 932–33 (11th Cir. 1987). In all of these cases, no predicate racketeering activity was directed at the plaintiff. The courts, therefore, did not find standing because in each case the plaintiff's injury was caused by the termination itself, not by the commission of predicate acts within the meaning of section 1962(c).

In *Shearin,* a terminated employee sued her former employer under section 1962(c), *inter alia.* 885 F.2d at 1168. Shearin alleged her former employer engaged in a scheme "whereby Hutton Trust would be created as a front for the purpose of charging fees to customers of Hutton Inc. for trust services which were never performed, thereby bilking customers to the brokerage firm." *Id.* at 1164. She alleged this scheme was furthered through predicate acts of mail fraud and securities fraud. *Id.* at 1166. Shearin further alleged she was "induced by telephone and mail to leave her previous employment and enter into an employment contract with [the employer] so that it would have the facade of a genuine trust company." *Id.* at 1164. Finally, Shearin alleged she was fired by her employer to prevent her from disclosing its illegal activities to bank examiners. *Id.*

In discussing whether Shearin had standing to sue for her former employer's alleged violation of section 1962(c), the Third Circuit observed Shearin's termination did not result from the defendant's predicate acts. *Id.* at 1168. It observed the "only possible exception to this conclusion is the allegation that [the defendant] fraudulently hired [the plaintiff] in part by means of an interstate phone call," which it found might constitute an act of wire fraud. *Id.* at 1168. The Third Circuit found, however, that such an act of wire fraud could not be considered a part of the pattern of racketeering involving the securities fraud. *Id.*

The Third Circuit found that under its ruling in *Barticheck v. Fidelity Union Bank/First Nat'l State,* 832 F.2d 36, 39 (3d Cir.1987), the alleged fraudulent hiring could not be considered part of the same pattern of racketeering as the alleged frauds perpetrated on the defendant's customers.

Shearin unsuccessfully attempts to bootstrap the hiring fraud [to the securities fraud scheme].... [T]he other acts alleged—collecting unlawful fees, hiding securities information, misrepresenting corporate duties to customers—are dissimilar from the act of fraudulently wooing an employee at one company to be corporate counsel at another. More significantly, the distinctive character of the unlawful activities set out was securities fraud.

*Shearin,* 885 F.2d at 1168. The court affirmed the district court's finding that the purported fraudulent hiring of Shearin was too attenuated from the securities fraud scheme to be considered part of the same pattern of racketeering. *Id.*

Having found the wire fraud was not part of the same pattern of racketeering as the one directed against customers, the court evaluated whether Shearin had standing to sue for a violation of section 1962(c) by virtue of her being allegedly fraudulently hired, which hiring involved the purported wire fraud. *Id.* It held that she did not have standing. The court found Shearin was not injured by a pattern of racketeering, because the allegedly fraudulent hiring was perpetrated through one predicate act consisting of wire fraud. *Id.* In addition, it held Shearin did not have standing because the allegedly fraudulent hiring did not amount to an injury: "Shearin cannot claim damages for job loss in being hired for a job in which she worked for two years, received due compensation, and even garnered a promotion. If ... the ... predicate acts ... injured anybody, they injured those ... customers whom the securities scheme defrauded." *Id.*

In the instant case, the Amended Complaint alleges Casper was induced to leave a position at the American Express Compa-

ny based on alleged misrepresentations made by the Defendants during her interview as to the nature of the position offered her at PaineWebber Inc., and that she was terminated over two years later. Amended Complaint, ¶¶ 47, 93. It alleges that in the process of being interviewed and hired for her position at PaineWebber Inc., she received mail and wire communications from the Defendants. *Id.*, ¶¶ 45–46. In addition, the Amended Complaint alleges Casper was subjected to extortion by the Defendants. It states she was forced to accept the diminution in the level of responsibility by a threat that if she did not acquiesce, she would be stripped of further responsibility or fired. *Id.*, ¶ 99. These are the sole Predicate Acts of racketeering the Amended Complaint alleges were directed at Casper.

■ Under the Third Circuit's decision in *Shearin*, the predicate acts allegedly committed by the Defendants during the process of hiring Casper are not part of the same pattern of racketeering alleged elsewhere in the Amended Complaint. A pattern of racketeering exists if the predicate acts "embrace[ ] criminal acts that have the same or similar purposes, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *H.J.*, 492 U.S. at 240, 109 S.Ct. at 2901; *see also Marshall–Silver Construction Co. v. Mendel*, 894 F.2d 593, 595 n. 1 (3d Cir.1990). As stated, continuity and relationship must be found among the predicate acts. *Sedima*, 473 U.S. at 496 n. 14, 105 S.Ct. at 3285 n. 14. The Third Circuit applies a case-by-case approach considering the number of acts, the length of time involved, the similarity of the acts, the number of victims, the number of perpetrators and the nature of the activities. *Marshall–Silver*, 894 F.2d at 596–97; *Barticheck*, 832 F.2d at 39.

In *Shearin*, the Third Circuit found the scheme to defraud customers and the predicate acts committed in furtherance of that

scheme were too attenuated from the fraudulent hiring scheme and the predicate act perpetrated in furtherance of the fraudulent hiring scheme to constitute part of the same pattern, notwithstanding the plaintiff's assertion that the fraudulent hiring scheme was executed for the purpose of lending legitimacy to the enterprise and concealing the scheme perpetrated against customers. 885 F.2d at 1168.

■ In the instant case, Casper alleges the Defendants perpetrated the Overriding Scheme involving mail and wire fraud and securities and tax law violations for the purpose of decreasing tax payments and increasing compensation to employees, thereby defrauding the Government and shareholders. Amended Complaint, ¶ 12. As in *Shearin*, Casper alleges she was hired through the use of interstate mail and wire for the purpose of lending legitimacy to the enterprise and creating an appearance that corrective measures were being taken within PaineWebber Inc. Amended Complaint, ¶ 34. Also as in *Shearin*, Casper appears to allege she was constructively or actually discharged for the purpose of preventing her disclosure of Defendants' illegal activities. *Id.*, ¶ 86. Under *Shearin*, the predicate acts allegedly perpetrated in the process of hiring Casper are not part of the same Pattern of Racketeering which was carried out for the purpose of defrauding the Government and shareholders.[7]

■ Turning to the Predicate Acts allegedly perpetrated against Casper, the Amended Complaint alleges Casper was injured by virtue of having been induced to leave her prior job at the American Express Company and by virtue of having been terminated two years later from her position at PaineWebber Inc. *Id.*, ¶¶ 43, 47, 141. As to her alleged injury by virtue of having been lured away from her position at the American Express Company, Cas-

---

7. Even if the purported predicate acts perpetrated against Casper were part of the pattern of racketeering executed in furtherance of the scheme to defraud the Government and shareholders, the result would not be different. Casper's injuries, whereby she was allegedly lured away from her previous position at the American Express Company and then discharged two years later from her position at PaineWebber Inc., do not form a basis for RICO standing. *See infra* pp. 1498–99.

per's claim of injury is unwarranted. As with the plaintiff in *Shearin,* Casper gained, in exchange for her leaving her position at the American Express Company, a position which she held for over two years, for which she received compensation and at which she promoted. *Id.,* ¶¶ 48, 82.

 As to her termination from her position at PaineWebber Inc., Casper does not allege this injury was caused by a "predicate acts sufficiently related to constitute a pattern...." *Sedima,* 473 U.S. at 496, 105 S.Ct. at 3285. Under the line of cases pertaining to "whistleblowers," the allegedly wrongful termination of Casper is not a predicate act under RICO and the resulting injury to Casper cannot form the basis for RICO standing. *See supra,* pp. 1495–96. Accordingly, Count Three is dismissed for failure to establish standing to sue for a violation of section 1962(c).

### 3. *Count Four—18 U.S.C. § 1962(d)*

Under section 1962(d), it is unlawful "for any person to conspire to violate any of the provisions of subsections [1962](a), (b), or (c)...." 18 U.S.C. § 1962(d). There is a split among the circuits on the issue of whether standing to sue for a violation of section 1962(d) is sufficiently stated by alleging that the injury resulted from conspiratorial acts even if they do not qualify as predicate acts or whether it is necessary to allege an injury caused by conspiratorial acts which are predicate acts. *See Hecht,* 897 F.2d at 25; *Reddy v. Litton Indus., Inc.,* 912 F.2d 291 (9th Cir.1990), *cert. denied,* —— U.S. ——, 112 S.Ct. 332, 116 L.Ed.2d 272 (1991). *But see Shearin,* 885 F.2d at 1169–70; *Flinders v. Datasec Corp.,* 742 F.Supp. 929, 933–34 (E.D.Va. 1990).

The view adopted by the Third Circuit is that in order to have standing to sue for violations of section 1962(d), a plaintiff must show injury by reason of an overt act that furthers the conspiracy. *Shearin,* 885 F.2d at 1169. "Predicate acts for conspiracy do not of necessity consist of section 1961(1) racketeering activity.... [A] conspiracy to commit the other RICO violations may occur absent the actual commis-

sion of the other violations or the racketeering activities that underpin them." *Id.* "[E]ither racketeering activity or classic overt conspiracy acts may qualify as 'predicate acts' to a RICO violation that causes injury." *Id.* The *Shearin* court specifically distinguished the requisites for standing under the first three subsections of 1962 from the requisites for standing under subsection (d). *Id.*

> Section 1964(c) states that a person need only sustain an injury 'by reason of a violation of section 1962' in order to sue.... [T]he Supreme Court expressly required that a person be 'injured in his business or property by the conduct constituting the violation'; it did not mandate that racketeering activity cause the harm.

*Id.* (quoting *Sedima,* 473 U.S. at 497, 105 S.Ct. at 3285); *see also Flinders,* 742 F.Supp. at 933–34.

In *Shearin,* plaintiff alleged defendants agreed upon a scheme to create a trust company "as a front for the purpose of charging fees to customers of [defendants] for trust services which were never performed." 885 F.2d at 1164. The plaintiff alleged as part of the scheme she was hired as trust counsel, corporate secretary and assistant vice president of the trust company in order to create a facade of a genuine trust company. *Id.* The plaintiff alleged she was subsequently dismissed to "prevent her from making disclosures about the defendants' illegal activities to the Delaware bank examiners." *Id.*

In *Shearin,* the court held that the conspiracy to fire Shearin in order to prevent the exposure of the illegal racketeering activity constituted an overt act furthering the conspiracy to commit racketeering violations which gave her standing to sue under section 1962(d). 885 F.2d at 1170. The *Shearin* court held, however, that the alleged conspiracy to lure Shearin from her prior job to work in a position which was a facade for the conspiracy did not establish an injury conferring standing under section 1962(d). *Id.* The court stated Shearin's loss of her former job was not an injury because she acquired a new position at

which she worked for two years at a level higher than her former position. *Id.*

In *Hecht*, the court rejected the finding in *Shearin* and held the plaintiff only has standing if he or she can show an "injury from overt acts that are also section 1961 predicate acts, and not only upon any and all overt acts furthering a RICO conspiracy." 897 F.2d at 25 (citing *In re Crazy Eddie Sec. Litig.*, 714 F.Supp. 1285, 1291–92 (E.D.N.Y.1989)). The *Hecht* court stated:

> Congress did not deploy RICO as an instrument against all unlawful acts. It targeted only predicate acts catalogued under section 1961(1). Admittedly, RICO is to be read broadly to effect its purpose. Its purpose, however, is to target RICO activities, and not other conduct.

*Id.* (citations omitted). The *Hecht* court also distinguished the facts in *Shearin*. It stated that unlike the facts in *Shearin*, the plaintiff in *Hecht* was not essential to the existence of the conspiracy. *Id.*

The Ninth Circuit in *Reddy*, also rejected the *Shearin* court approach. In *Reddy*, the plaintiff discovered his employer's bribery scheme and reported it to his superiors. The plaintiff was subsequently fired; he brought a RICO action alleging his employment was terminated because he would not participate in the defendants' scheme to cover-up the illegal bribes. *Id.* at 293. Although the *Reddy* court adopted the Second Circuit's approach in *Hecht*, it also distinguished its facts from those in *Shearin*. It stated the plaintiff in *Reddy*, unlike Shearin was "peripheral, not central, to the very existence of the conspiracy." *Id.* at 295.

■ The Amended Complaint alleges Casper has standing to sue for a violation of section 1962(d) by alleging:

> Defendants' violations of 18 U.S.C. sec. 1962(d) and their overt acts in furtherance thereof, proximately caused injury to [Casper] in her business or property in that [Casper] was harmed by reason of Defendants' perpetration of the Predicate Acts, by reason of their Pattern of Racketeering Activity, by reason of Defendants' hiring, employment, and firing of [Casper], by reason of overt acts in furtherance of the Defendants' conspiracy, and by reason of their violations of 18 U.S.C. sec. 1962(d). But for the Defendants' conspiratorial agreement and activities they could not have perpetrated their unlawful activities and schemes, including those which directly injured [Casper]. [Casper's] injuries were the direct, natural, foreseeable, and the proximate result of Defendants' racketeering violations and overt acts in furtherance of their conspiracy in that her hiring, the course and nature of her employment, and her firing were all in furtherance of and apart of Defendants' conspiratorial plan to commit the aforesaid racketeering violations. The harm to her includes but is not limited to the pecuniary and other loss she suffered, as described above.

*Id.*, ¶ 153.

The Defendants argue Casper, unlike the plaintiff in *Shearin*, was not asked to participate in the Overriding Scheme. Moving Brief at 25–26. The Defendants further argue Shearin was terminated to prevent her from revealing the scheme, but here Casper had already disclosed the alleged scheme prior to her termination. *Id.* at 26. The Defendants argue, unlike the plaintiff in *Shearin* who was hired only as a "window dressing" for the scheme, Casper's position was legitimate, as evidenced by the valuable services performed by Casper on the Defendants' behalf. *Id.* at 26–27. Lastly, the Defendants cite to *Drohan v. Sorbus, Inc.*, 401 Pa.Super. 29, 584 A.2d 964 (App.Div.1990), in which the plaintiff lacked standing under section 1962(d) because the plaintiff alleged neither that he was asked to participate in the scheme nor that he had challenged the alleged practices because he considered them to be illegal. *Id.* at 44, 584 A.2d 964.

The Defendants' correctly point out the facts of this case are distinguishable from the facts of *Shearin*. As was the case in *Reddy* and *Hecht*, Casper was not central to the alleged conspiracy. In *Shearin*, plaintiff was hired to be an employee of a newly formed trust company set up to

perpetrate the conspiracy. Here, the alleged Overriding Scheme had been ongoing since 1976, and most recently since 1986. Casper was not hired as a central figure for the purposes of perpetrating the conspiracy, but rather she was peripheral to the existence of the alleged conspiracy.

Casper characterizes the reasons she was fired as follows:

> The total elimination ... of Casper's responsibility and authority in a major area of her job.... was taken by Defendants in retaliation for [Casper's] failure to 'cooperate' with implementing certain of the policies and practices of [Defendants] which [she] had advised ... were not lawful....

Amended Complaint, ¶ 86. Nevertheless, Casper does not allege she was asked or directed to perpetrate the allegedly illegal activities.

The only allegations pertaining to Casper's involvement in allegedly illegal activities are that "Schwartz directed Casper to make necessary entries to show" an employee was a New Jersey resident and employee, who was really employed in New York, Amended Complaint, ¶¶ 62–63, that "Schwartz instructed ... Casper to see how disclosure could be avoided in the 1989 annual proxy statement of [an employee's] guaranteed deferred bonus," *id.*, ¶ 67, and that Schwartz told Casper that she did not need to follow-up on disclosure forms for officers because the establishment of the

procedure was sufficient. *Id.*, ¶ 79. Aside from having to falsely record an employee's place of employment, the above-mentioned allegations do not ask or direct Casper to engage in illegal conduct or directly involve Casper with the allegedly illegal conduct.

Importantly, in *Shearin*, the plaintiff's hiring and employment responsibilities were not the overt acts found for the conspiracy, but rather the court held only the firing of Shearin, to prevent disclosure to bank examiners, constituted an overt act in furtherance of the conspiracy for purpose of standing under section 1962(d). 885 F.2d at 1164. In this case, Casper alleges the Defendants fully exposed her to the various unlawful tax evading schemes. *See e.g.*, Amended Complaint, ¶¶ 43, 53, 57. The fact that Defendants fired Casper would not prevent her from disclosing the alleged illegalities, but rather invites Casper to disclose the alleged unlawful schemes. Accordingly, the firing was not done in furtherance of the conspiracy.

In light of the facts that Casper was only a peripheral figure to the conspiracy, that Casper was not asked or directed to engage in the conspiracy and because the firing of Casper would not have been in furtherance of the conspiracy, Casper has failed to allege standing as required under section 1962(d). The motion to dismiss Count Four is granted.[8]

---

**8.** In light of the above discussion, Casper is reminded:

> At a time when the federal courts—which are a scarce dispute resolution resource, indeed—are straining under the pressure of an ever-increasing caseload, we simply cannot tolerate this type of litigation. Particularly with regard to civil RICO claims, plaintiffs must stop and think before filing them. If used correctly, the civil RICO provisions may have many salutary effects. When used improperly, as in this case, those provisions allow a complainant to shake down his opponent and, given the expense of defending a RICO charge, to extort a settlement. Such improper use of the civil RICO provisions comes at the expense of the federal judiciary and those who need ready access to the courts.

*Pelletier v. Zweifel*, 921 F.2d 1465, 1522 (11th Cir.), *reh'g denied en banc*, 931 F.2d 901, *cert. denied*, — U.S. —, 112 S.Ct. 167, 116 L.Ed.2d 131 (1991) (emphasis omitted); *see also Cham-*

*bers v. NASCO, Inc.*, — U.S. —, 111 S.Ct. 2123, 115 L.Ed.2d 27 *reh'g denied*, — U.S. —, 112 S.Ct. 12, 115 L.Ed.2d 1097 (1991); 28 U.S.C. 1927.

In this case, the Amended Complaint, asserting three additional RICO violations, was filed in response to the initial motion to dismiss which the Defendants served on Casper in February 1991. The three additional RICO claims are not based on new factual allegations but appear to be a direct response to the Defendants' challenge of Casper's standing under section 1962(d) in the initial motion to dismiss.

In light of the fact that Casper was aware of the Defendants' challenge based on lack of standing and in fact had the assistance of the Defendants' moving brief for the initial motion to dismiss and the fact that the Amended Complaint failed to allege facts establishing standing on all four RICO counts, it is fair to assume that those facts do not exist. Accordingly, such facts

## C. RICO Pleadings

### 1. *Distinct Enterprise and Defendants*

Even if Casper is found to have standing under section 1962, the Defendants move to dismiss Count Three brought under section 1962(c) on the ground Casper has failed to sufficiently plead the existence of an enterprise which is distinct from the individual defendant. Moving Brief at 29. Casper argues the Enterprise is a collective entity which has an existence greater than the members of which it is comprised. Opp. Brief at 28. In addition, Casper argues a defendant and the enterprise may be the same if the enterprise is the victim and perpetrator of the wrongdoing. *Id.*

As previously stated, section 1962(c) prohibits any "person" employed by or associated with any "enterprise" from conducting or participating in the "conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). A person is defined to include "any individual or entity capable of holding a legal or beneficial interest in property...." *Id.,* § 1961(3). Pursuant to section 1962(c), the "person" must be "employed by or associated with" an enterprise. An "enterprise" is defined to include "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact though not a legal entity." *Id.,* § 1961(4).

In *B.F. Hirsch v. Enright Refining Co.,* 751 F.2d 628 (3d Cir.1984), the Circuit stated the "person" subject to liability must be a separate and distinct entity from the "enterprise." *Id.* at 633; *see also Glessner,* 952 F.2d at 710; *Brittingham,* 943 F.2d at 301; *Petro–Tech, Inc. v. Western Co. of North America,* 824 F.2d 1349, 1359 (3d Cir.1987); *Albert Einstein Medical Center v. Physicians Clinical Servs., Ltd.,* No. 90–3387, 1991 WL 193391, *2, 1991 U.S.Dist. LEXIS 13302, *5 (E.D.Pa. 18 Sept. 1991); *Elysian Fed. Sav. Bank v.*

*First Interregional Equity Corp.,* 713 F.Supp. 737, 757 (D.N.J.1989).

The *Hirsch* court explained:

One of the Congressional purposes in enacting RICO was to prevent the takeover of legitimate businesses by criminals and corrupt organizations. It is in keeping with that Congressional scheme to orient section 1962(c) toward punishing the infiltrating criminals rather than the legitimate corporation which might be an innocent victim of the racketeering activity in some circumstances.

751 F.2d at 633–34 (citations omitted); *see also Petro–Tech,* 824 F.2d at 1359. "The distinctiveness requirement ensures that RICO sanctions are directed at the persons who conduct the racketeering activity, rather than the enterprise through which the activity is conducted." *Brittingham,* 943 F.2d at 301.

The Third Circuit has held that "nothing precludes an association of corporations for illicit purposes from constituting an enterprise." *Shearin,* 885 F.2d at 1165–66. However, the allegation of an association in fact does not affect the separate inquiry into whether the alleged enterprise is separate and distinct from the defendant. *Brittingham,* 943 F.2d at 300. The *Brittingham* court stated:

[A] § 1962(c) enterprise must be more than an association of individuals or entities conducting the normal affairs of a defendant corporation. A corporation must always act through its employees and agents, and any corporate act will be accomplished through an 'association' of these individuals or entities. Consequently, the [*Hirsch* ] rule would be eviscerated if a plaintiff could successfully plead that the enterprise consists of a defendant corporation in association with employees, agents, or affiliated entities acting on its behalf.

*Id.* at 301.

In *Petro–Tech,* the plaintiff asserted several section 1962(c) claims. The court dis-

---

would not be forthcoming if Casper were given an opportunity to file a second amended complaint with respect to the RICO claims brought under sections 1962(a), (b) and (c). Although

no sanctions are imposed at this time, it is appropriate to dismiss Counts One through Four of the Amended Complaint.

missed those counts where the complaint named the corporation as both the enterprise and the defendant person. 824 F.2d at 1359. The court, however, allowed recovery for the counts where:

> The enterprise ... is alleged to be an association of fact consisting of [the corporation] and the individual defendants. Because [the corporation] is alleged to have attempted to benefit from its employees' racketeering activity, it is appropriate to allow victims of that activity to recover from [the corporation].

*Id.* at 1361.

The *Brittingham* court explained the *Petro–Tech* holding is limited to the situation in which the complaint alleges that the corporation has taken a separate and active role in the racketeering activities also committed by the employees. 943 F.2d at 302. In *Brittingham*, the defendants were Mobile and Mobile Chemical and the enterprise was alleged to consist of Mobile, Mobile Chemical and advertising agencies. *Id.* at 303. The court held that the plaintiff did not establish a separate and distinct enterprise, for purposes of a summary judgment, by grouping the named defendants with their advertising agencies. *Id.* The court stated: "The advertising agencies were defendants' agents, and did no more than conduct the normal affairs of the defendant corporations. The defendant corporations were the actual entities through which the alleged racketeers carried out their fraudulent activity." *Id.* Because the plaintiffs did not establish that the defendant corporations took a distinct role in the racketeering activity, the court granted summary judgment. *Id.*

Recently, in *Glessner*, the Third Circuit further refined its position regarding the separate and distinct pleading requirements for an enterprise. 952 F.2d at 713. The court recognized that although *Petro–Tech* allowed for an exception where the corporation plays a separate and active role in the racketeering activities committed by the employees or agents of the corporation, "*Brittingham* requires plaintiffs' complaint to allege the corporate defendants to have played some distinct and active role in the alleged racketeering activity apart from the actions of their employees, affiliates, and agents if they are jointly to be regarded as an association in fact." *Id.,* at 712.

In *Glessner*, the consumer plaintiffs sued three corporate defendants, Blueray, Meenan and KOV, and individual officers for injuries suffered as a result of purchases of allegedly defective residential oil furnaces manufactured and sold by Blueray, a subsidiary of Meenan which was later acquired by KOV. *Id.,* at 706. The section 1962(c) claim named, *inter alia*, Blueray, Meenan and KOV as defendants and the alleged enterprise was an association-in-fact made up of Blueray, Meenan, an officer and other persons. *Id.,* at 710.

The court held the enterprise was not separate and distinct from the defendants because the plaintiffs did not allege that Blueray, Meenan or KOV had an active role in the racketeering activities apart from the activities of their affiliated entities, employees and agents. *Id.* at 713. Specifically, the court held Meenan did not become an active participant by virtue of a corporate acquisition, its expenditure of assets on marketing and selling activities or its receipt of profits from the sales of the furnaces. *Id.* Likening its facts to *Brittingham*, the court rejected plaintiffs' association-in-fact pleading theory and dismissed the section 1962(c) claim.

In this case, the Amended Complaint alleges the existence of an association-in-fact. The Amended Complaint states:

> At all times relevant hereto, [Paine-Webber Inc.] and [Paine Webber Group], together and in association with additional subsidiaries of [Paine Webber Group] and divisions of [PaineWebber Inc.] (including Paine Webber International) have constituted an association-in-fact "enterprise" ... within the meaning of that term as used in 18 U.S.C. sec. 1961 *et seq.*

Amended Complaint, ¶ 116. The Amended Complaint describes the organizational structure of the Enterprise as follows:

> Paine Webber [Group] was the holding company which owned PaineWebber

[Inc.] and had ultimate control over its activities. Routine corporate organizational management and control for Paine Webber [Group's] subsidiaries was provided by corporate operations headquarters which was centralized in the New Jersey and New York offices of PaineWebber [Inc.]. The bulk of the immediate authority and control over corporate operations for Paine Webber [Group] and its subsidiaries was in the hands of a group of highly-placed executives, most of whom were also directors of and/or proxy officers for PaineWebber [Inc.].... All of these executives pursued not only lawful corporate objectives but also the unlawful corporate objectives described above and through their acts, the Corporate Defendants acted.

*Id.*, ¶ 117. It alleges that the "nature ... of the Enterprise ... was such that it had an existence distinct from an individual person or entity employed by or associated with the Enterprise." *Id.*, ¶ 119.

Casper argues that the Enterprise is a collective entity which is "something more than the members of which it is comprised." Opp. Brief at 28. Therefore, Casper argues the section 1962(c) Defendants are distinct entities from the alleged association-in-fact Enterprise. *Id.* Accordingly, it must be determined whether the Enterprise is no more than an association of individuals or entities acting on behalf of a defendant corporation.

In *Brittingham*, the Third Circuit, citing *Atlas Pile Driving Co. v. DiCon Fin. Co.*, 886 F.2d 986, 995 (8th Cir.1989), recognized that a collective entity comprised of individual defendants is something more than the members of which it is comprised. 943 F.2d at 301. The court distinguished that situation from a case where the defendant is a collective entity itself. The *Brittingham* court explained:

Unlike individual defendants, a corporation can act only through its employees and agents. *Petro–Tech* holds that a defendant also named as an enterprise cannot be held vicariously liable for the actions of its employees. A plaintiff can-

not circumvent this holding merely by alleging that the enterprise is an association in fact consisting of the defendant and individuals or entities acting on its behalf. *Without allegations or evidence that the defendant corporation had a role in the racketeering activity that was distinct from the undertakings of those acting on its behalf, the distinctiveness requirement is not satisfied.*

*Id.* at 302 (emphasis added).

▪ In this case, Casper cannot circumvent the pleading requirements by alleging that the Enterprise is a collective entity. Because it is a collective entity comprised of corporate defendants, Casper must still allege racketeering conduct on the part of the Defendants which is apart from the undertakings of the Defendants' agents and entities. Nowhere in Casper's submissions does she substantiate the allegation that the Enterprise "had an existence distinct from an individual person or entity employed by or associated with the Enterprise." *Id.*, ¶ 119. Accordingly, the allegations of the Amended Complaint do not satisfy the distinctness requirement of section 1962(c).

▪ In the alternative, Casper argues under *Rose*, a defendant and enterprise need not be distinct when the enterprise is both the victim and the perpetrator of the alleged violation. Opp. Brief, 28 (citing *Rose*, 871 F.2d at 359). The *Brittingham* court recognized "[i]t is theoretically possible for a corporation to take a separate 'active' role in RICO violations also committed by its employees. The corporation would not be the passive victim of racketeering activity, but the active perpetrator." 943 F.2d at 302 (citing *Rose*, 871 F.2d at 359). The court, however, declined to speculate as to the circumstances which would give rise to such a claim.

In *Rose*, the plaintiff alleged the party functioned as an enterprise in that it served as the vehicle for some of the defendants' predicate acts, but it also functioned as a person because it conducted the affairs of the county. 871 F.2d at 359. The court stated *Hirsch* governs those cases in which

an innocent or passive corporation is victimized by the RICO persons. *Id.* at 358. It further stated *Hirsch* did not "preclude an entity from functioning both as an 'innocent victim' of certain racketeering activity, and thus be the enterprise under section 1962(c), and as a perpetrator of other such activity, and thus be a person under that subsection." *Id.* at 359. The court held the claim was valid because the acts performed by agents of the party "would have victimized the county 'enterprise' (and its residents) as well as the plaintiffs." *Id.*

In this case, the Amended Complaint does not establish any set of circumstances suggesting the Enterprise engaged in separate Predicate Acts from the acts of the individual defendants. Casper's reliance on *Rose* is misplaced. *See, e.g. Teti v. U.S. Healthcare, Inc.*, Nos. 88–9808, 88–9822, 1989 WL 143274, *2, 1989 U.S.Dist. LEXIS 14041, *8–9 (E.D.Pa. 21 Nov. 1989) ("[P]laintiffs did not allege separate predicate acts, some of which were perpetrated by the parent ... and some perpetrated by the subsidiaries.... reliance on *Rose*, therefore, is misplaced."). Accordingly, in addition to Count Three being dismissed for lack of standing, *see supra* pp. 1494–98, it is also dismissed for failure to establish that the Enterprise is separate and distinct from the Defendants.

### 2. *Elements of RICO*

To establish a valid RICO violation the plaintiff must plead that the defendants (1) conducted (2) an enterprise through (3) a pattern (4) of racketeering activity. *Sedima*, 473 U.S. at 497–98, 105 S.Ct. at 3285–86; *Keystone Ins. Co. v. Houghton*, 863 F.2d 1125, 1129 (3d Cir. 1988). Each of these elements must be alleged to state a claim under RICO. *Sedima*, 473 U.S. at 496, 105 S.Ct. at 3285. Injury to plaintiff's business or property is necessary to confer standing for a private plaintiff. *Id.; Keystone Ins. Co.*, 863 F.2d at 1129.

In the event Casper is found to have alleged standing under section 1962, the Defendants argue Casper has not sufficiently pleaded the allegations of fraud establishing the racketeering activity. Mov-

ing Brief at 34–35. The Defendants argue, pursuant to Rule 9(b) of the Federal Rules of Civil Procedure, Casper must plead fraud with particularity. *Id.* In addition, the Defendants argue Casper has failed to plead a pattern of racketeering activity. *Id.* at 35–37.

#### a. Fraud

Rule 9(b) of the Federal Rules of Civil Procedure provides: "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed.R.Civ.P. 9(b). "[A] complaint need not read like a laundry list of dates, times and persons involved in the underlying transaction." *Wiley v. Hughes Capital Corp.*, 746 F.Supp. 1264, 1284 (D.N.J.1990). As the Third Circuit explained in *Seville Indus. Machinery Corp. v. Southmost Mach. Corp.*, 742 F.2d 786 (3d Cir.1984), *cert. denied*, 469 U.S. 1211, 105 S.Ct. 1179, 84 L.Ed.2d 327 (1985):

Rule 9(b) requires plaintiffs to plead with particularity the "circumstances" of the alleged fraud in order to place the defendants on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of immoral and fraudulent behavior. It is certainly true that allegations of "date, place or time" fulfill these functions, but nothing in the rule requires them. Plaintiffs are free to use alternative means of injecting precision and some measure of substantiation into their allegations of fraud.

742 F.2d at 791; *see also Saporito v. Combustion Eng'g Inc.*, 843 F.2d 666, 675 (3d Cir.1988).

In this case, the Amended Complaint alleges the following fraudulent acts: fraudulent tax characterizations; offshore expatriate employee income tax fraud; fraudulent use of the Fair Labor Standards Act; fraudulent expatriate tax clean-up; fraudulent signing bonus tax; fraudulent concealment of compensation; fraudulent use of a Key Executive Equity Program at PaineWebber Group and failure to impute income from perquisites. Amended Complaint, ¶¶ 21–79. These allegations can be

categorized as tax and securities fraud. In addition to these racketeering acts, the Amended Complaint alleges the Defendants engaged in wire and mail fraud to carry out the above-mentioned acts. *Id.,* ¶¶ 23, 25, 42, 55, 59, 68, 70.

The Amended Complaint provides adequate specificity as to the allegations of fraud in this case. The allegations are straightforward. The Amended Complaint describes the nature of the alleged fraudulent tax schemes implemented by the Defendants, the persons involved or who approved them and the time period during which they were carried out.

██ With respect to the mail and wire fraud schemes, the Amended Complaint alleges the time of the fraud and the persons involved in it and states the nature of the information conveyed. *See e.g.,* ¶ 23. Although not each allegation of mail or wire fraud includes a reference to a specific date, but rather refers to a general time frame during which the alleged fraud occurred, "[i]t is the function of discovery to fill in the details and of trial to establish fully each element of the cause of action." *Elysian Fed. Sav.,* 713 F.Supp. at 757. Under the liberal requirements of notice pleading, the allegations in the Amended Complaint satisfy Rule 9(b). Accordingly, the Defendants' motion to dismiss the Amended Complaint on the ground that the allegations of fraud are not pled with sufficient particularity is denied.

b. Pattern of Racketeering

The Defendants also seek to dismiss Counts One through Four on the ground that the Amended Complaint does not allege a continuity plus relationship.[9] Moving Brief at 35–37.

The definition of a pattern requires at least two acts of racketeering activity within a ten year period. 18 U.S.C. § 1961(5). The Supreme Court has held "two isolated acts of racketeering activity do not constitute a pattern." *Sedima,* 473 U.S. at 496 n. 14, 105 S.Ct. at 3285 n. 14; *see also Insurance Consultants,* 746 F.Supp. at

413. The essential characteristics of a pattern of racketeering activity are "continuity plus relationship" and the "threat of continuing activity." *Sedima,* 473 U.S. at 496 n. 14, 105 S.Ct. at 3285 n. 14.

In *H.J. Inc.,* the Supreme Court reiterated " '[t]he term pattern itself requires the showing of a relationship' between the predicates ... and of the 'threat of continuing activity.' It is this factor of *continuity plus relationship* which combines to produce a pattern." 492 U.S. at 239, 109 S.Ct. at 2900 (quoting 116 Con.Rec. 18940 (1970) (Sen. McClellan), as quoted in *Sedima,* 473 U.S. at 496 n. 14, 105 S.Ct. at 3285 n. 14). The Court observed: "Congress[ ] inten[ded] that to prove a pattern of racketeering activity a plaintiff or prosecutor must show that the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity." *Id.* (emphasis in original).

As to the relatedness requirement, the Court repeated the principle that "criminal conduct forms a pattern if it embraces criminal acts that have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *Id.,* 492 U.S. at 240, 109 S.Ct. at 2901 (citing *Sedima,* 473 U.S. at 496 n. 14, 105 S.Ct. at 3285 n. 14). To determine relatedness, the Court focused on whether the alleged predicate acts " 'are interrelated by distinguishing characteristics and are not isolated events.' " *Id.*

The Court found it necessary to analyze the continuity requirement at greater length than the relatedness requirement. The Court commenced by stating that in order to form a pattern, "the predicate acts themselves [must] amount to, or ... they [must] otherwise constitute a threat of, *continuing* racketeering activity." *Id.* (emphasis in original). The Court eschewed the requirement that continuity be demonstrated through allegations of multiple schemes, holding: "What a plaintiff or prosecutor must prove is continuity of racketeering activity, or its threat, *simpli-*

---

9. Casper did not oppose this argument in the Opp. Brief.

*citer.* This may be done in a variety of ways, thus making it difficult to formulate in the abstract any general test for continuity." *Id.* 492 U.S. at 241, 109 S.Ct. at 2901.

In fleshing out the meaning of the continuity requirement, the Court stated: " 'Continuity' is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *Id.* (citing *Barticheck,* 832 F.2d at 39). It stated that a party alleging a RICO violation "may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time." *Id.,* 492 U.S. at 242, 109 S.Ct. at 2902.

The Court further explained:

Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement: Congress was concerned in RICO with long-term criminal conduct. Often a RICO action will be brought before continuity can be established in this way. In such cases, liability depends on whether the *threat* of continuity is demonstrated.

Whether the predicates proved establish a threat of continued racketeering activity depends on the specific facts of each case. Without making any claim to cover the field of possibilities—preferring to deal with this issue in the context of concrete factual situations presented for decision—we offer some examples of how this element might be satisfied. A RICO pattern may surely be established if the related predicates themselves involve *a distinct threat of long-term racketeering activity,* either implicit or explicit.... The continuity requirement is likewise satisfied where it is shown that *the predicates are a regular way of conducting defendant's ongoing legitimate business....*

The limits of the relationship and continuity concepts that combine to define a RICO pattern, and the precise methods by which relatedness and continuity or its threat may be proved, cannot be fixed in advance with such clarity that it will always be apparent whether in a particular case a "pattern of racketeering activity" exists. The development of these concepts must await future cases, absent a decision by Congress to revisit RICO to provide clearer guidance as to the Act's intended scope.

*Id.,* at 242–43, 109 S.Ct. at 2902–03 (emphasis added) (citations and footnote omitted).

In *H.J. Inc.,* customers of a telephone company brought suit alleging the telephone company had been bribing state regulatory officials to gain approval for excessive telephone rates. The Court found the "racketeering predicates occurred with some frequency over at least a 6–year period, which may be sufficient to satisfy the continuity requirement." 492 U.S. at 250, 109 S.Ct. at 2906; *see also, Hindes v. Castle,* 937 F.2d 868, 873 (3d Cir.1991) ("duration is sine qua non of continuity"). The Court also held the "alleged bribes were a regular way of conducting [the defendant's] ongoing business, or a regular way of conducting or participating in the conduct of the alleged and ongoing RICO enterprise." 492 U.S. at 250, 109 S.Ct. at 2906. Accordingly, the Court found the requisite continuity.

The Third Circuit has declined to read *H.J. Inc.* as defining continuity solely as a temporal concept. *Marshall–Silver,* 894 F.2d at 597; *see also Kehr Packages,* 926 F.2d at 1413; *Insurance Consultants,* 746 F.Supp. at 414. The Third Circuit stated:

[I]f the Court in *H.J. Inc.* intended that the *duration* of the predicate acts or the threat arising therefrom should be determinative without reference to whether the societal threat was limited to a single, one time injury, we would not have expected the Court to eschew providing a specific standard in favor of a fact oriented, case-by-case development.

*Marshall–Silver,* 894 F.2d at 597.

Citing the Supreme Court's decision in *H.J. Inc.,* the Third Circuit observed that in order to establish the existence of a pattern of racketeering, it is necessary "to show the continuity and relationship between the discrete racketeering activities." *Shearin,*

885 F.2d at 1166. It further observed that under its decision in *Barticheck*, 832 F.2d at 39, a multi-factor approach is adopted in determining whether the predicate acts are sufficiently continuous and interrelated to constitute a pattern, pursuant to which the number of acts, the length of time involved, the similarity of the acts, the number of victims, the number of perpetrators, and the nature of the activities are considered. *Shearin*, 885 F.2d at 1166; *Kehr Packages, Inc.*, 926 F.2d at 1412; *see also Marshall–Silver*, 894 F.2d at 597 (pointing to case-by-case analysis of pattern requirement which considers size and magnitude of fraud as being part of pattern analysis).

Recently, the Third Circuit affirmed the dismissal of RICO allegations for failure to establish a pattern of racketeering. In *Kehr Packages, Inc.*, the plaintiffs alleged the defendants made a fraudulent promise to lend money to the plaintiffs to effectuate a leveraged buy-out. 926 F.2d at 1410–11. The court held because the "relative criminal conduct occurred during the initial eight month period, when the misrepresentations were made," the plaintiffs had not sufficiently pled continuity. *Id.* at 1418. The *Kehr Packages, Inc.* court further stated there was no way of establishing the alleged fraud was a regular way of conducting business because two of the defendant loan officers had since left their positions and there was no indication they treated other customers in a similar manner. *Id.* The court also stated, unlike *H.J. Inc.*, the "direct target of the alleged criminal activity was a single entity." *Id.* Lastly, the court stated "[a]lthough the number of misrepresentations can be an important factor, ... the repeated misrepresentations did not contribute any injury additional to that already inflicted." *Id.* at 1419.

In *Marshall–Silver*, the complaint alleged extortion and mail fraud in connection with the filing of a false bankruptcy petition. 894 F.2d at 595. The court held because the predicate acts were concluded in less than seven months and there was no threat of additional repeated criminal conduct, the plaintiff failed to sufficiently allege a RICO pattern. *Id.* at 597.

In *Banks*, the plaintiffs alleged, *inter alia*, that the defendants used an inside partner to drive down the price of a piece of real estate. 918 F.2d at 420. With respect to that scheme, the Third Circuit held there was no RICO pattern because the scheme "was an attempt to defraud a single investor of his interest in a single piece of real estate over a relatively short period of time." *Id.* at 422. *But see Swistock v. Jones*, 884 F.2d 755 (3d Cir.1989) (continuity existed where fraud lasted one year and defendants made misrepresentations with respect to other possible transactions); *Keyes Martin & Company v. Prudential Bache Sec., Inc.*, No. 92–92, 1991 WL 152789, *7, 1991 U.S.Dist. LEXIS 10573, *23 (D.N.J. 29 July 1991) (continuity requirement satisfied where plaintiff alleged four years of repeated fraudulent conduct).

■ Applying the foregoing principles to the case at bar, it appears the Amended Complaint establishes a continuity plus relationship. The Amended Complaint alleges the acts of mail fraud, tax fraud and securities fraud occurred on numerous occasions during the time period as early as 15 October 1970 and most recently since 1986, three of which occurred in the last ten years. Amended Complaint, ¶¶ 104–105. It alleges the Predicate Acts

> have sufficient continuity to constitute a "pattern of racketeering activity" within the meaning of 18 U.S.C. sec. 1961 *et seq.* They possess continuity in that they were committed by the Defendants as part of long-term repetitions of a criminal scheme of national and even international proportions. Additionally, the Predicate Acts are characterized by continuity of racketeering activity in that they were practiced upon many victims ... over a long period of time, and involving a nefarious array of illegal practices, all in furtherance of the overriding illegal purpose.

*Id.*, ¶ 106. The Amended Complaint alleges there is a threat of continuing criminal activity as demonstrated by the "widespread nature of the unlawful activities described above and their ability to with-

stand all corrective efforts of [Casper], the person then ostensibly authorized to make changes in the practices." *Id.,* ¶ 109.

The alleged Predicate Acts satisfy the interrelatedness test; the alleged mail fraud, tax fraud and securities fraud are all related to the common purpose of the Overriding Scheme to underreport employee compensation and to enjoy an illegal employee compensation tax savings. With respect to continuity, the Predicate Acts involve an ongoing scheme which has become the normal course of business and which poses a threat of continuing. Significantly, the Predicate Acts have been ongoing with frequency since 1970 and most recently since 1986. Accordingly, the Amended Complaint sufficiently establishes the continuity plus relationship test. The motion to dismiss on these grounds is denied.

### D. CEPA

The Defendants move to dismiss the New Jersey claims in Counts Five and Seven through Fourteen on the ground that Casper has elected to pursue an exclusive claim under CEPA. Moving Brief at 38–42. The Defendants argue if Casper sues under CEPA, she waives rights to sue for other state law claims. *Id.* at 38.

Casper argues the waiver provision in CEPA cannot be invoked against claims involving a different set of operative facts from her CEPA claim. Opp. Brief at 33. In addition, Casper argues the waiver provision of section 8 has not been interpreted so as to limit the rights of an employee whose position has been terminated as a result of the employee being a whistle blower. *Id.* at 34. Casper also argues that

section 5 of CEPA [10] clarifies the scope of the statute. Casper argues that this section permits "plaintiffs to pursue other statutory remedies in addition to the tort remedies already provided for by CEPA." *Id.* at 36.

Section 8 of CEPA provides:

Nothing in this act shall be deemed to diminish the rights, privileges, or remedies of any employee under any other federal or State law or regulation or under any collective bargaining agreement or employment contract; except that *the institution of an action in accordance with this act shall be deemed a waiver of rights and remedies available* under any other contract, collective bargaining agreement, State law, rule or regulation or *under the common law.*

N.J.S.A. 34:19–8 (emphasis added).

Although the New Jersey Supreme Court has not ruled on CEPA, other courts have interpreted CEPA to be a comprehensive remedy for retaliatory actions against employees who blow the whistle on their employers.[11] *See e.g. Morris v. Cove,* No. 88–1287, 1989 WL 76496, *10–11, 1989 U.S.Dist. LEXIS 7946, *31 (D.N.J. 7 July 1989); *Parker v. M & T Chem., Inc.,* 236 N.J.Super. 451, 456–67, 566 A.2d 215 (App. Div.1989) (CEPA codifies preexisting common law tort for retaliatory discharge and New Jersey's policy of protecting employee's freedom to decline to perform act that would violate clear mandate of public policy); *Potter v. Village Bank of New Jersey,* 225 N.J.Super. 547, 560, 543 A.2d 80 (App. Div.), *cert. denied,* 113 N.J. 352, 550 A.2d 462 (1988) (same); *Lepore v. National Tool & Mfg. Co.,* 224 N.J.Super. 463, 470, 540

---

**10.** Section 5 of the CEPA provides:
... [U]pon the application of any party, a jury trial shall be directed to try the validity of any claim under this act specified in the suit. All remedies available in common law tort shall be available to prevailing plaintiffs. These remedies are in addition to any legal or equitable relief provided by this act or any other statute.
N.J.S.A. 34:19–5 (1990).

**11.** When a federal court is faced with a state statute that has not been interpreted, it must "predict how the New Jersey Supreme Court

would rule if presented with this case." *Repola v. Morbark Indus., Inc.,* 934 F.2d 483, 489 (3d Cir.1991); *see also, McWilliams v. Yamaha Motor Corporation,* 780 F.Supp. 251 (D.N.J.1991); *National–Standard Co. v. Clifton Ave. Corp.,* 775 F.Supp. 151 (D.N.J.1991). "In predicting how the highest state court would decide an issue, the federal court may look to analogous state court cases, treatises, restatements and law review articles." *Id.; see also Aetna Casualty & Surety Co. v. Farrell,* 855 F.2d 146, 148 (3d Cir.1988).

A.2d 1296 (App.Div.1988), *aff'd*, 115 N.J. 226, 557 A.2d 1371 (1989).

In *Morris* the court held that a plaintiff forfeits his common law claim for retaliatory discharge by alleging a claim under CEPA. 1989 WL 76496, *10, 1989 U.S.Dist. LEXIS 7946, *30; *see also Labib v. Younan,* 755 F.Supp. 125, 129 n. 3 (D.N.J.1991); *Dondero v. Lenox China,* No. 89–3083, 1989 WL 145044, *1, 1989 U.S.Dist. LEXIS 14220, *3 (D.N.J. 20 Nov. 1989). The *Morris* court held, however, asserting a claim under CEPA "does not foreclose all state law claims. It only bars suits that are 'in accordance with' its terms." 1989 WL 76496, *11, 1989 U.S.Dist. LEXIS 7946, *32 (quoting N.J.S.A. 34:19–8); *see also Abbamont v. Piscataway Township Board of Educ.,* 238 N.J.Super. 603, 605, 570 A.2d 479 (App.Div. 1990) ("CEPA does not supplant any common law causes of action").

In *Moore v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.,* No. 90–1182, 1990 WL 105765, 1990 U.S.Dist. LEXIS 9201 (D.N.J. 16 July 1990), the plaintiff filed a nineteen count complaint invoking age discrimination claims, unfair labor claims and common law claims which related to her discharge such as common law claim for retaliatory discharge, breach of an implied employment contract intentional interference with an employment contract, libel, slander and invasion of privacy. *Id.,* 1990 WL 105765, *1–3, 1990 U.S.Dist. LEXIS 9201, *2–7. The *Moore* court held the waiver provision in CEPA only precluded the plaintiff from bringing a common law action against her employer for retaliatory conduct. *Id.,* 1990 WL 105765, *2, 1990 U.S.Dist. LEXIS 9201, *5. Accordingly, only the common law claim for retaliatory discharge was held to be waived by the CEPA claim. *Id.,* 1990 WL 105765, *2, 1990 U.S.Dist. LEXIS 9201, *6.

In this case, in addition to the CEPA claim, the Amended Complaint alleges the Defendants violated the New Jersey RICO statute, violated New Jersey public policy and terminated Casper with malice, inflicted emotional distress upon her, violated the NJLAD, failed to return Casper's personalty, converted Casper's personalty, breached an employment contract to pay Casper a bonus in accordance with Paine Webber Inc.'s policy and violated their internal policy to pay employees severance.

Count Five of the Amended Complaint, which alleges a violation of the New Jersey RICO statute is waived by the CEPA claim. The only injury alleged by Casper are her hiring and firing. As previously discussed, Casper suffered no injury from being hired. *See supra* pp. 1498–99. Casper alleges she was fired in retaliation for the fact she did not participate in the Defendants' fraudulent acts. Amended Complaint, ¶ 86. Although CEPA precludes a plaintiff from bringing a CEPA claim and a common law claim for retaliatory discharge, where the only injury alleged from the New Jersey RICO claim is retaliatory discharge, such claim would also fall within CEPA's waiver provision. Accordingly, Count Five is dismissed.

Count Seven of the Amended Complaint asserts the Defendants violated New Jersey public policy when they terminated Casper's position. Amended Complaint, ¶¶ 163–65. As previously stated, CEPA was designed to codify all common law rights and New Jersey public policy against retaliatory discharge. Because Count Seven is based on the same legal theory as the claim asserted under CEPA, Count Seven is deemed waived. The motion to dismiss is granted with respect to Count Seven.

Casper's claim under the EPA and NJLAD are not waived by alleging a violation of CEPA. Casper's claims for unequal pay derive from a separate set of facts from her allegation that she was discharged in retaliation for having threatened to inform authorities of the Defendants' alleged fraudulent scheme. The EPA and NJLAD claims are based on allegations that she was paid less than her male counterparts; Casper's CEPA claim is based on allegations that she was discharged because the 14 December 1989 Memorandum implicated she would blow the whistle on the Defendants' practices. Accordingly, under *Morris,* Casper's CEPA

claim does not foreclose her claims under the EPA and NJLAD. The motion to dismiss is denied with respect to Count Nine.

■ Counts Eight and Ten through Fourteen withstand the Defendants' motion to dismiss. The state law contract claims and tort claims for infliction of emotional distress, replevin and conversion are all based on separate and distinct legal theories from the statutory claim for retaliatory discharge. Accordingly, Counts Eight and Ten through Fourteen are not precluded by the waiver provision in CEPA. The motion to dismiss is denied with respect to Counts Eight and Ten through Fourteen.

### E. Unequal Pay Claims

Defendants also move to dismiss Count Nine on the ground that Casper has failed to plead the EPA[12] and NJLAD[13] claims with specificity. Moving Brief at 43. Defendants argue that Casper does not sufficiently plead the elements of a claim for unequal pay under either the EPA or the NJLAD. *Id.* Defendants state Casper must plead "that, as compared to certain males, she was engaged in equal work, and that her position required equal skill, equal effort and equal responsibility." *Id.* at 45. Casper maintains the Amended Complaint sufficiently pleads her claims under the EPA and NJLAD. Opp. Brief, 37–38.

Rule 8 of the Federal Rules of Civil Procedure requires that a complaint must contain a short and plain statement of the claim which indicates the plaintiff is entitled to relief. Fed.R.Civ.P. 8(a)(2). This pleading requirement provides the defendant with "fair notice of what plaintiff's claim is and the grounds upon which it rests." *Conley*, 355 U.S. at 47, 78 S.Ct. at 102. The Third Circuit requires, however, that civil rights claims be pled with a higher level of factual specificity. *Hynson v. Chester, Legal Dept.*, 864 F.2d 1026, 1031 (3d Cir.1988); *District Council 47, American Federation of State, County and Municipal Employees v. Bradley*, 795 F.2d 310, 313 (3d Cir.1986); *Frazier v. Southeastern Penn. Trans. Auth.*, 785 F.2d 65, 69 (3d Cir.1986).

■ "[T]he crucial questions are whether sufficient facts are pleaded to determine that the complaint is not frivolous, and to provide the defendants with adequate notice to frame an answer." *Id.*, at 69. The plaintiff is not required to allege the identity and circumstances of those individuals who received more favorable treatment. *See e.g., West v. First Penn. Bank, N.A.*, No. 89–4730, 1990 WL 106858, *4, 1990 U.S.Dist. LEXIS 9339, *11 (E.D.Pa. 25 July 1990); *French v. Sameric Corporation*, No. 89–589, 1989 WL 30695, *1, 1989 U.S.Dist. LEXIS 3239, *1 (E.D.Pa. 30 March 1989). Such factual specificity is generally lacking prior to discovery. *West*, 1990 WL 106858, *4, 1990 U.S. Dist. LEXIS 9339, *11.

The EPA "prohibits employers from discriminating on the basis of sex by paying unequal wages 'for equal work on jobs the performance of which are requires equal skill, effort, and responsibility, and which are performed under similar working conditions'...." *Brobst v. Columbus Servs. Int'l*, 761 F.2d 148, 150–51 (3d Cir.1985),

---

**12.** Section 206 of the EPA provides:

No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) or a differential based on any other factor other than sex: *Provided,* That an employer who is paying a wage rate differential in violation of this subsection shall not, in order to comply with the provisions of this subsection, reduce the wage rate of any employee.

29 U.S.C. § 206(d).

**13.** Section 10:5–4 of the NJLAD provides:

All persons shall have the opportunity to obtain employment ... without discrimination because of race, creed, color, national origin, ancestry, age, marital status or sex, subject only to conditions and limitations applicable alike to all persons.

N.J.S.A. 10:5–4.

*cert. denied,* 484 U.S. 1043, 108 S.Ct. 777, 98 L.Ed.2d 863 (1988).

The Supreme Court has stated:

In order to make out a case under the [EPA], the [plaintiff] must show that an employer pays different wages to employees of opposite sexes 'for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions.'

*Corning Glass Works v. Brennan,* 417 U.S. 188, 195, 94 S.Ct. 2223, 2228, 41 L.Ed.2d 1 (1974). At the motion to dismiss stage, Casper's allegations must raise an inference that she is being denied equal pay for equivalent work because of her sex. *See West,* 1990 WL 106858, *4, 1990 U.S.Dist. LEXIS 9339, *22; (citing *Flesch v. Eastern Penn. Psychiatric Inst.,* 434 F.Supp. 963 (E.D.Pa.1977)).

 The Amended Complaint alleges Casper, "because of her gender, was not paid compensation equal to that of males in similarly situated job positions at Defendant PaineWebber [Group]." Amended Complaint, ¶ 171. In *West,* the court found that plaintiff's allegation that the defendant treats female employees less favorably than male employees with regard to compensation, job assignments, working conditions, training, promotion and other terms of employment adequately notified defendant of its wrongful conduct. 1990 WL 106858, *4, 1990 U.S.Dist. LEXIS 9339, *12; *see also French v. Sameric Corp.,* 1989 WL 30695, *1, 1989 U.S.Dist. LEXIS 3239, *1 (E.D.Pa.1989) (allegation that men were better paid for equivalent jobs sufficient to state equal pay claim).

Casper's allegations adequately put the Defendants on notice of a violation of the EPA. The Amended Complaint establishes the scope, duties and responsibilities of Casper in her position at Paine Webber Group. The Amended Complaint alleges that males in "similarly situated job positions" received higher compensation than her. Amended Complaint, ¶ 171. Significantly, a plaintiff is not required to allege specific details prior to discovery. Accordingly, giving Casper the benefit of all rea-

sonable inferences that can be drawn from the Amended Complaint, she sufficiently pleads a claim under the EPA and the NJLAD.

*Conclusion*

For the reasons set forth above, the motion to dismiss is granted with respect to Counts One through Five and Count Seven, and is denied with respect to Count Six and Counts Eight through Fourteen.